[Cite as *Thacker v. Thacker*, 2010-Ohio-5675.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY


MELANIE THACKER,

     PLAINTIFF-APPELLEE,               CASE NO. 9-10-26

     v.

SHANE A. THACKER,                O P I N I O N

     DEFENDANT-APPELLANT.


Appeal from Marion County Common Pleas Court
Family Division
Trial Court No. 2005 DR 0199

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

Date of Decision: November 22, 2010


APPEARANCES:

    *J. C. Ratliff* for Appellant

    *Kevin P. Collins* for Appellee

**ROGERS, J.**

{¶1}  Defendant-Appellant, Shane Allen Thacker, appeals the judgment of the Court of Common Pleas of Marion County, Family Division, denying his motion to reallocate parental rights and responsibilities, and granting Plaintiff-Appellee's, Melanie Lynn Thacker, motion to recalculate child support and modify parenting time.  On appeal, Shane argues that the trial court erred in denying his motion for shared parenting because its findings were not supported by competent, credible evidence; that the trial court erred in modifying the parenting time schedule; and, that the trial court erred in imputing income to him at his prior rate of earning and in increasing his child support obligation.  Based upon the following, we affirm the judgment of the trial court modifying the parties' parenting time schedule and denying Shane's motion for shared parenting, but reverse the judgment of the trial court recalculating Shane's child support obligation.

{¶2}  Shane and Melanie were married in August 1998.  Four children were born of the marriage including Madelyn Thacker, Collin Thacker, Sophia Thacker, and Gabriel Thacker (hereinafter collectively referred to as "the children").  In February 2006, the parties terminated their marriage.  The decree of divorce designated Melanie as the legal custodian and residential parent of the children.  Shane was granted parenting time with the children from Sunday at 6:00

P.M. until Wednesday at 5:00 A.M.  Additionally, the trial court ordered Shane to pay child support to Melanie in the amount of $106.84 per month per child.

{¶3}  In September 2009, Shane filed a motion to reallocate parental rights and responsibilities for the children and a proposed shared parenting plan. Additionally, Shane filed a motion for an order of contempt against Melanie, arguing that she failed to refinance the mortgage obligation on the marital residence as ordered by the February 2006 divorce decree.  Shane's proposed shared parenting plan suggested that he receive parenting time and be designated the residential parent every Thursday from the end of his workday until Monday morning, except that, once each month, his parenting time would end Tuesday morning, and that Melanie would receive parenting time and be designated the residential parent at all remaining times.

{¶4}  In October 2009, Melanie responded to Shane's motions, alleging that he should not be granted shared parenting and that his proposed parenting plan should not be adopted because he had been convicted of domestic violence against a child who was a member of his household; because he had twice been convicted for violating a civil protection order; because he had been charged with public indecency, which resulted in a conviction for disorderly conduct; because he had been convicted of falsification; because he was required to take medication and attend counseling to treat his bipolar disorder in conjunction with his

falsification conviction, but now denied he had the condition; and, because she was afraid of him. Additionally, Melanie argued that, since the February 2006 divorce decree, Shane's work hours had changed and she had completed her education; that it was not appropriate for Shane to have the children on school nights; and, that allowing Shane to have the children every weekend was unfair because she would have no recreational time with them. Additionally, Melanie moved for a recalculation of child support on the basis that her and Shane's employment situations had changed.

{¶5} In December 2009, Shane filed another motion for contempt against Melanie, arguing that she willfully and repeatedly interfered with his right to parenting time with the children, and that she failed to offer him the right of first refusal to care for the children.

{¶6} In February 2010, Melanie filed a trial brief arguing that shared parenting was not in the children's best interests because of Shane's alleged history of child abuse, spousal abuse, and other domestic violence; because she had been the victim of some of Shane's violence, which resulted in the parties being unable to cooperate and make joint decisions concerning the children; because Shane had been convicted of domestic violence against a child who was a member of his household; because Shane was twice convicted of violating a civil protection order Melanie had obtained against him, which occurred from Shane's

conduct toward her at exchanges of the children; because, in 2002, three minor children identified Shane as a person who exposed his penis to them, resulting in a charge of public indecency, and Shane's plea to a reduced charge of disorderly conduct; because, in conjunction with his falsification conviction, Shane was required to take medication and attend counseling to treat his bipolar disorder, but that he now denied the condition and refused to take medication or attend counseling; because the children had always lived with Melanie and were well-adjusted to their home and school; because Shane did not take proper care of the children, who had various medical problems; because Shane failed to make all of his required child support payments and failed to pay half of the uninsured medical expenses and child care as ordered by the divorce decree; and, because Shane had refused to seek appropriate medical treatment for the children in emergency and routine situations.

{¶7} Melanie further argued that Shane's motions for contempt should be denied because it was Shane's failure to meet Collin's medical needs that necessitated his absence from visits with Shane for a period of time. Finally, Melanie proposed that Shane should receive parenting time every other weekend from 4:15 p.m. on Friday until 8:30 p.m. on Sunday, and that child support be increased to $170.72 per month per child.

{¶8} Thereafter, Shane filed a trial brief arguing that, in November 2008, the parties agreed that he would receive visitation with the children from Thursday evening until Monday morning every week, and Monday night visitations every other week to accommodate the parties' schedules, and that the parties had been voluntarily following this schedule since November 2008. Shane argued that his request for reallocation of parental rights and responsibilities merely adopted the visitation schedule the parties had voluntarily been following.

{¶9} The case proceeded to a final hearing on February 11, 2010, at which the following testimony was heard.

{¶10} Kenneth Warren, of the Family Services Department, testified that he met with Shane and Melanie each for approximately one hour; that he met with each of the children for approximately fifteen to twenty minutes; that he observed each parent's home; that he did not observe a pattern of failure to facilitate parenting time between the parties; and, that he recommended decreasing the amount of parenting time Shane was currently receiving. Warren continued that he believed children should be taken to the emergency room for injuries such as falling from a high slide and becoming unresponsive, being bitten on the head by a dog, or sustaining bruised and bleeding genitals from falling; that he did not believe it would be good judgment in these situations for a parent to fail to take the child to the emergency room, and to call the other parent who is out of town to

pick up the child instead; and, that he believed the court should require a parent diagnosed with bipolar disorder to receive mental health treatment as a condition of receiving parenting time.

{¶11} Melanie testified that she had five children, including the four Thacker children and a son from a previous marriage; that she had made arrangements to move the family to a four-bedroom home; that she was employed as a registered nurse; that the 2006 divorce decree provided that Shane would have parenting time from Sunday at 6 p.m. until Wednesday morning at 5 a.m., corresponding with Shane's days off work, and that each party would have the right of first refusal to have parenting time with the children if the other parent would otherwise leave the children in the care of another; that, at some point thereafter, Shane lost his job and they agreed to change visitation so that Shane would have the children from every Friday evening until Monday before school; that, in early 2009, she began to offer Thursday evenings as parenting time for Shane because she was in school during that time and was abiding with the right of first refusal; that, around February or March 2009, she and Shane verbally agreed to change visitation whereby Shane would have the children every Thursday until Monday; that, in June 2009, she finished school, so the parties went back to the Friday through Monday arrangement; and, that she agreed to increase Shane's parenting time to the Thursday through Monday arrangement temporarily

because she was required to under the right of first refusal, but that she did not want Shane to have the right of first refusal, because she did not believe he was an adequate caretaker of the children.

{¶12} Melanie continued that the children had some health issues, including that Sophia had a history of seizures, migraines, and had been diagnosed as possibly carrying the gene for neurofibromatosis, and that Collin had ADHD; that she had denied Shane visitation with Collin for approximately the month of October 2009 because he had poison ivy that resulted in a serious wound due to Shane's improper care; that the children had issues with head lice a few years earlier; that she treated the lice, but the children continued to have lice, so she treated them again; that there had been no hygiene problems with the children; that she took Madelyn to the emergency room after she fell and injured her genital area, and Shane did not go with her because he was afraid he would be accused of abuse; that she took Collin to the emergency room after he fell from a slide; that she picked Gabriel up from Shane's home and took him to the emergency room after he was bitten by a dog because Shane refused to take him; that Collin's poison ivy resulted in an open wound while he was in Shane's care because Shane had not properly cared for the injury and put a bandage on it that was extremely tight; and, that Shane also failed to administer Collin's medication properly.

{¶13} Melanie continued that she worried about the safety of the children while in Shane's care due to his "violent past" and "poor judgment" regarding their medical care (hearing tr., p. 220); that, in 2002, Shane was convicted of domestic violence against Joshua, her eight-year-old son from a previous marriage; that Joshua sustained a black eye that was swollen shut, a bruised and swollen face, dry, crusted blood on his nose, a bloody nose, and bruised handprints on his throat; that she was afraid of Shane due to the violence she sustained throughout their relationship and marriage, including that he hit her, pulled her hair, kicked her, threatened her with a knife, and abused her verbally; that the violence escalated throughout the marriage; that Shane had threatened violence if she called the police; that, when she filed for divorce, Shane threatened to burn her and the children in their home; that, when Shane was taking medication for bipolar disorder, his behavior improved; and, that she had requested exchanges of the children take place at the Sheriff's department because Shane made a "nasty" comment to her and tried to get in her vehicle on one occasion when the parties were exchanging the children.

{¶14} Melanie continued that Shane's change in employment resulted in them not having medical insurance for some time; that she would be able to provide medical insurance for the children; that Shane had not always made timely child support payments; that, in 2006, when child support was initially calculated,

she earned $14,000 a year; and, that she was earning $46,800 a year at the time of the hearing.

{¶15} Shane testified that he and his fiancée, Kelly Harris, lived together in a four-bedroom home; that all four girls, including his two daughters and Harris's two daughters, shared one bedroom; that he was working for Guardian Protection, his previous employer, but was no longer a salaried employee after being dismissed in December 2009; that he made $32,000 in 2006 and $27,349 in 2009; that his income had decreased from the time of the divorce decree; that he made $250 to $300 in December 2009, and $150 in January 2010; that he did not plan on seeking unemployment benefits because he was getting ready to start a new job; that he expected to make an income comparable to his previous job in the security industry; and, that he did not know whether he had paid half of the children's daycare expenses because he just paid what Melanie told him to.

{¶16} Shane continued that he often received more parenting time than was provided in the 2006 divorce decree at Melanie's behest; that, in November 2008, he and Melanie came to a verbal agreement that he would have parenting time from Thursday until Monday morning, or occasionally Monday evening; that the parties cooperated with this agreement; that, in September 2009, when he filed the motion to reallocate parental rights and responsibilities, Melanie stopped allowing him to have parenting time from Thursday until Monday, and reverted to their

previously agreed to Friday to Monday schedule; and, that he believed the parties should continue to have the right of first refusal for parenting time.

{¶17} Shane testified further that he never put his children in any type of danger; that he had assisted his children with their homework in the past, but that they rarely brought homework assignments during his parenting time; that, in October 2009, when Melanie had denied him visitation with Collin, he had treated Collin's poison ivy according to the directions on the medication bottle, and then, when the wound worsened, he applied some antiseptic spray, ointment, and gauze that he purchased; that, when Madelyn injured her genital area by falling on a footboard, he "picked her up, * * * had [his] mom come up," and had his mother check her for injuries (Id. at 127); that he and his mother took her to the emergency room because she had a laceration; that Melanie came to the hospital with her insurance card, but did not go into the hospital; and, that he took Gabriel to the hospital when he was bitten by a dog. Shane continued that he had concerns about the children while in Melanie's care because the children had repeated issues with head lice; because their hair was unkempt and their clothing was usually torn; and, because he did not believe all the children could safely ride in Melanie's sports car because one of the seatbelts was "literally for insurance purposes." (Id. at 130).

{¶18} Shane continued that, in 2002, Melanie's nine-year-old son was residing as a member of his household; that he and the child had a dispute over homework that became violent; that he entered a plea of guilty to violating a protection order Melanie had obtained against him; that, as a result of his plea, he was required to "comply with doctor's recommended treatment," which was treatment for his bipolar disorder (Id. at 152); that, in late 2006, a new doctor took him off medications because the doctor did not believe he had bipolar disorder, but was just depressed due to his bad marriage; that he was not currently on any medication; that he entered a plea of no contest to a disorderly conduct charge that arose when three minor females claimed he exposed his penis to them; and, that his conviction for falsification was a misunderstanding because he had tried to file a domestic violence order against Melanie, and then tried to recant.

{¶19} Harris, Shane's fiancée, testified that she had a good relationship with the children; that she had two children of her own; that she and Shane both assisted the children with homework, and that Shane was very patient with the children in doing their homework; that she had not seen Shane lose his temper in front of the children; that she had no concerns about Shane's parenting; that she, Shane, and the children spent every Friday night together as a family; and, that Shane was a "phenomenal" father.

{¶20} Harris continued that she had concerns about the children's hygiene because occasionally, when they received the children from Melanie's care, they had inappropriate clothing, unbrushed hair, and unclean faces; that the children had lice at some point; that she had voiced her hygiene concerns to personnel at Epworth Preschool and Daycare (hereinafter "Epworth"), and that they told her they had noticed those issues; that, when Collin fell, she went to the hospital, and she and Melanie "literally walked in the door together" (id. at 88); that she had seen Melanie and Shane interact in a friendly manner; that Shane was voluntarily changing to a career in insurance; and, that the "company that he's actually changing to is a company that he's been looking at for two years." (Id. at 95).

{¶21} Robin Rick, the director at Epworth, testified that she was familiar with the Thacker family; that the children began attending Epworth in September 2005; that the parties had issues in the prior six weeks concerning who was allowed to pick up the children from Epworth; and, that she had observed no problems with the children's hygiene, school attendance, or clothing, and had never voiced any such concerns to the parties.

{¶22} Rose Brough testified that she was an assistant teacher at Epworth; that she was familiar with the Thacker family; that she had no concerns about the children's hygiene or clothing, and had never voiced any concerns to the parties; that Shane had brought clothing to Epworth for the children including snow pants,

gloves, and hats; and, that she could not tell from the children's hygiene or behavior whether they had come from Shane's or Melanie's home.

{¶23} Elizabeth Lister testified that she was Shane's mother; that she had a good relationship with the children; that the parties used to get along; that Shane did not voluntarily leave his previous employment, but was fired; that she had observed Shane help the children with homework, and he was very patient with them; that she was present when Madelyn injured her genital area by falling on a footboard; that Shane took Madelyn to the hospital, not Melanie; that Melanie appeared at the hospital and gave Shane a medical card, but did not go into the hospital; that, when Gabriel was bitten by a dog, she and Shane took him to the hospital; that Melanie came to the hospital, but did not go in; and, that Melanie sent the children to school with inappropriate clothing and ill-fitting footwear.

{¶24} At the hearing, Warren's Family Service Coordinator's Report was admitted as an exhibit, and provided, in pertinent part, that the right of first refusal was not in the best interests of the children due to the history of conflict between the parties; that Melanie reported the parties' marriage ended due to Shane's violent behavior; that Melanie reported that, based on things the children had told her, she was concerned about Shane excessively disciplining them; that Melanie related that, during an exchange of the children in October 2009, Shane attempted to get into her vehicle and said "What are you going to do, bitch?" while the

children were present (Warren Report, p. 8); and, that Melanie reported Shane did not take the children to school in a timely fashion on Mondays.

{¶25} Warren's report continued that Shane reported Melanie had told the children that he wanted to take them away from her, and that he wanted them to get thrown out of their house; that Shane reported Melanie was responsible for his violation of the civil protection order because she created disturbances and knew how to "push [his] buttons to get [him] angry," but that he no longer "let her get to him" (id. at 12); that Shane related that he did not remember the particulars about the domestic violence incident for which he was convicted; that Shane reported that his falsification charge arose because Melanie struck him with a telephone, he reported the incident, and then recanted the incident because he did not want her to get in trouble; that Shane stated, following the divorce, he often had the children five or six days a week; that, in November 2008, Shane stated he began receiving parenting time from Thursday until Monday, but that, since he filed the "papers," he only received parenting time from Friday to Monday; that, during the October 2009 exchange incident, Shane reported that he looked into Melanie's vehicle to see if one of the children was still inside, and Melanie screamed obscenities at him, shoved him, and accused him of trying to steal her vehicle; that Shane believed any conflict between the parties was one-sided on Melanie's part; that Shane stated he had concerns about the safety of the children in Melanie's care

because her prior boyfriend's child had been abducted, because she had a "revolving door of men," because the children had become sunburned on vacation while in her care, because the children had contracted lice while in her care, and because the staff at Epworth allegedly told him that the children did not get enough sleep while in Melanie's care and were unclean after being at her home (id. at 15); that Shane reported that Melanie allowed the children to listen to inappropriate music; and, that Shane claimed Melanie interfered with his right of first refusal.

{¶26} Warren found that both parties' homes were appropriate; that there was no finding of child abuse or neglect by either of the parties regarding the Thacker children; and, that Shane had been charged with domestic violence on two occasions, involving Melanie and her son from a prior relationship, and with violation of civil protection orders. Warren concluded in his report that he did not believe it was in the best interests of the children to have a shared parenting plan; that he believed Melanie should be the children's residential parent; that he believed the children would benefit from weekend visitation with Shane; that he recommended Shane receive parenting time every other weekend from Friday until Sunday evening at 6:00 p.m.; and, that he believed the right of first refusal was not in the best interests of the children given the history of conflict between the parties.

{¶27} Also admitted at the hearing were multiple exhibits including (1) a March 2002 judgment entry of Shane's conviction for domestic violence, (2) a June 2005 judgment entry of Shane's conviction for violating Melanie's civil protection order against him, (3) a September 2006 judgment entry of Shane's conviction for violating Melanie's civil protection order against him, (4) an October 2002 judgment entry of Shane's conviction for an amended charge of disorderly conduct, accompanied by a police report alleging that Shane had exposed his penis to three minor females, (5) a February 2005 judgment entry of Shane's conviction for falsification, ordering that "Defendant shall comply with any/all doctors orders regarding his treatment for bipolar disorder" (Feb. 2005 judgment entry, p. 2), (6) an October 9, 2009 discharge report from the Marion General Hospital diagnosing Collin with poison ivy, (7) an October 20, 2009 report from the Smith Clinic stating that Collin had an open infected wound on his leg that required extensive care, and (8) various other October 2009 documents detailing Collin's wound-related medical care.

{¶28} Thereafter, the trial court issued a judgment entry denying Shane's motions for contempt against Melanie, denying Shane's motion for shared parenting, and granting Melanie's motion to modify parenting. In granting Melanie's motion, the trial court found that there had been a change in circumstances; that it was in the children's best interests that Melanie remain the

residential parent and legal custodian; and, that Shane be granted visitation on alternating weekends from Friday evening until 6:00 p.m. on Sundays. The trial court specifically found that the children had incurred various injuries while in Shane's care, with all but one of the children requiring emergency room care; that Shane's testimony about who took the children to the emergency room was not credible; that Shane had been convicted of domestic violence against a household member; that Shane had been convicted of violating a domestic violence civil protection order obtained by Melanie; that the parties had adjusted their visitation schedule over the years to accommodate their changing work schedules; and, that Melanie allowed Shane increased parenting time while she was attending school because she was required to under the right of first refusal, but that she did not want Shane to have the right of first refusal because she was worried about the children's safety while in his care.

{¶29} Regarding child support, the trial court found that Melanie earned $44,132 per year, and that Shane had recently been terminated from salaried employment and was working on a contract basis; that Shane indicated he would be starting a new career and anticipated income at his prior rate; that his prior income of $32,700 would be imputed to Shane; that Melanie should provide health insurance for the children; and, that Shane should pay Melanie child support of $173.02 per month per child.

{¶30} It is from this judgment that Shane appeals, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN DENYING APPELLANT'S MOTION FOR SHARED PARENTING AS ITS FINDINGS WERE NOT SUPPORTED BY COMPETENT, CREDIBLE EVIDENCE.**

*Assignment of Error No. II*

**THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN MODIFYING APPELLANT'S PARENTING TIME SCHEDULE WITH THE MINOR CHILDREN.**

*Assignment of Error No. III*

**THE TRIAL COURT ERRED IN IMPUTING INCOME TO APPELLANT AT HIS PRIOR RATE OF EARNINGS AND INCREASING HIS CHILD SUPPORT OBLIGATION.**

{¶31} Due to the nature of Shane's arguments, we elect to address his first and second assignments of error together, preceded by an overview of the standard of review.

*Standard of Review*

{¶32} Decisions concerning child custody matters rest within the sound discretion of the trial court. *Miller v. Miller* (1988), 37 Ohio St.3d 71, 74. Custody determinations are some of the most difficult and agonizing decisions a trial judge must make, and, therefore, appellate courts must grant wide latitude to their consideration of the evidence. *Davis v. Flickinger* (1997), 77 Ohio St.3d

415, 418. Therefore, a reviewing court will not reverse a trial court's decision regarding child custody absent an abuse of discretion. *Masters v. Masters* (1994), 69 Ohio St.3d 83, 85. A finding of abuse of discretion requires evidence that the decision of the trial judge was unreasonable, arbitrary, or unconscionable. *Leigh v. State Emp. Relations Bd.* (1996), 76 Ohio St.3d 143, 144.

{¶33} When a reviewing court applies the abuse of discretion standard, it may not substitute its own judgment for that of the trial court. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80.

*Assignments of Error Nos. I & II*

{¶34} In his first assignment of error, Shane argues that the trial court erred and abused its discretion in denying his motion for shared parenting because its findings were not supported by competent, credible evidence. Specifically, Shane argues that, despite the 2006 order designating Melanie as the children's residential parent, the parties substantively had been following a shared parenting order due to their verbal agreement, and that, consequently, the trial court should

have applied the "best interests factors" to that living situation. Additionally, Shane disputes the trial court's finding that the parties could not cooperate; argues that no evidence suggested he suffered from mental health issues; contends that Melanie's testimony about his refusal to seek proper medical treatment for the children was not credible; that Melanie's testimony that she was afraid of him and feared for the safety of the children while in his care was not credible, given that she voluntarily expanded his visitation in the past; that any domestic violence concerns about Shane based on prior acts were known to Melanie at the time of the initial divorce hearing, and could not be heard at this hearing on the principles of res judicata; that there was no testimony that the children had suffered any harm or had been exposed to domestic violence while in his care post-divorce; and, that the trial court should not have awarded Melanie parenting time beginning at 6:00 p.m. on Sundays because the children would be in the custody of a third party until Melanie returned from work at 8:30 p.m.

{¶35} In his second assignment of error, Shane argues that the trial court erred and abused its discretion in modifying the parties' parenting time schedule. Specifically, Shane contends that, in November 2008, the parties voluntarily increased Shane's parenting time to four and one-half days of parenting time per week; that, as this was the visitation schedule the parties were following rather than the court-ordered schedule, there was no change in circumstances warranting

a reduction in his parenting time; that Melanie's testimony about her concerns was not credible because she had voluntarily expanded his parenting time in the past; that he presented evidence that the parties were cooperative; that the trial court failed to engage in a meaningful analysis of why a decrease in his parenting time was in the children's best interests; that the schedule adopted by the trial court reduced his visitation to less than was normally recommended by Marion County Local Rule 32.1; that the trial court should not have eliminated the parties' right of first refusal; that the trial court failed to engage in an analysis of the statutory factors set forth in R.C. 3109.051; and, that the trial court did not engage in a meaningful, independent review of the evidence.

## I. *Modification of Prior Court Orders*

**{¶36}** R.C. 3109.04(E) governs modification of prior court orders allocating parental rights and responsibilities and provides as follows:

> **(E)(1)(a) The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:**
>
> **\* \* \***

**(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.**

**(b) One or both of the parents under a prior decree allocating parental rights and responsibilities for the care of children that is not a shared parenting decree may file a motion requesting that the prior decree be modified to give both parents shared rights and responsibilities for the care of the children. The motion shall include both a request for modification of the prior decree and a request for a shared parenting order that complies with division (G) of this section. Upon the filing of the motion, if the court determines that a modification of the prior decree is authorized under division (E)(1)(a) of this section, the court may modify the prior decree to grant a shared parenting order, provided that the court shall not modify the prior decree to grant a shared parenting order unless the court complies with divisions (A) and (D)(1) of this section and, in accordance with those divisions, approves the submitted shared parenting plan and determines that shared parenting would be in the best interest of the children.**

Thus, in order for a trial court to modify a prior allocation of parental rights and responsibilities, it must make a threshold finding that a change in circumstances has occurred, and, if so, it must then determine that the modification is in the best interest of the child. *Wooten v. Schwaderer*, 3d Dist. No. 14-08-13, 2008-Ohio-3221, ¶3.

### A. *Change in Circumstances*

**{¶37}** As Shane has argued that the trial court erred in finding that a change in circumstances had occurred, we will first analyze this threshold issue

before addressing his contention that the trial court erred in finding that shared parenting was not in the best interests of the children.

**{¶38}** The threshold finding that a change in circumstances has occurred requires a change of substance, not a slight or inconsequential change. *Wooten*, 2008-Ohio-3221, at ¶4. This Court has previously stated that "'the change does not have to be quantitatively large, but rather, must have a material effect on the child.'" *McLaughlin v. McLaughlin Breznenick*, 3d Dist. No. 8-06-06, 2007-Ohio-1087, ¶16, quoting *Tolbert v. McDonald*, 3d Dist. No. 1-05-47, 2006-Ohio-2377, ¶31.

**{¶39}** Here, Shane argues that, because the parties had been voluntarily following a parenting schedule whereby he had the children for four and one-half days per week for a period of time beginning in November 2008, there was no change in circumstances to warrant a reduction in his parenting time. Melanie argues that Shane should not be permitted to raise this argument on appeal, as he did not argue this argument at the trial court level; and, that, Shane's repeated failure to procure appropriate medical treatment for the children constituted a change in circumstances.

**{¶40}** Initially, we note that Shane's September 2009 motion to reallocate parental rights and responsibilities specifically claimed that "there has occurred a change of circumstances warranting modification of custody." Thus, at the trial

court level, Shane argued a theory contrary to the argument he brings on appeal. Even if Shane's arguments were consistent, we also cannot find that the trial court erred in finding a change in circumstances had occurred. The trial court found in its judgment entry that a change in circumstances had occurred "based upon the variances in the parenting time and upon the increasing conflict between the parents[.]" (Judgment Entry, p. 8). The trial court's finding was supported by Melanie's testimony at the hearing that she and Shane did not cooperate together and did not speak; that Shane had violated a civil protection order Melanie had obtained against him; that the parties had disagreements concerning the children's medical care; that the parties had disagreements concerning who could pick up the children from Epworth; and, that the parties had a confrontation while exchanging the children, necessitating that exchanges take place at the police station. Although Shane testified that the parties were able to cooperate and any conflict was one-sided on Melanie's part, corroborated by Harris, we reiterate that the trial court is in the best position to observe the witnesses and weigh the credibility of testimony. See *Seasons Coal*, supra. Further, the trial court found a change based upon the variances in parenting time. Testimony was heard at the hearing that the parties had modified parenting time multiple times due to the parties' changing work and school schedules. Consequently, we cannot find that the trial court erred

in finding a change in circumstances had occurred due to increasing conflict between the parties and variances in parenting time.

*B. Children's Best Interests*

**{¶41}** Next, we turn to Shane's argument that a reduction in his amount of parenting time and the denial of his motion for shared parenting and was not in the children's best interests.

**{¶42}** In determining the best interests of the children pursuant to R.C. 3109.04(B)(1), trial courts are directed to consider all relevant factors, including those specifically enumerated under R.C. 3109.04(F)(1), the following of which are pertinent to the case sub judice:

> **(a)  The wishes of the child's parents regarding the child's care;**
>
> **(b)  If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;**
>
> **(c)  The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;**
>
> **(d)  The child's adjustment to the child's home, school, and community;**
>
> **(e)  The mental and physical health of all persons involved in the situation;**

**(f)   The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;**

**(g)   Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;**

**(h)   Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child[;]* * ***

**{¶43}** Additionally, in determining whether shared parenting is in the children's best interests, trial courts are directed to consider all relevant factors, including the following pertinent enumerated factors:

**(a)   The ability of the parents to cooperate and make decisions jointly, with respect to the children;**

**(b)   The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;**

**(c)   Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;**

R.C. 3109.04(F)(2).

**{¶44}** Here, although Shane claims that the parties had voluntarily been following a shared parenting plan, Melanie testified that the parties had changed their parenting time arrangement multiple times due to changes in their work and school schedules; that she only offered Shane increased parenting time from

-27-

Thursday until Monday for several months in 2009 because she was in school and was required to offer Shane that time under the right of first refusal; and, that when she finished school in June 2009, the parties went back to the Friday to Monday schedule. Although Shane testified that this arrangement persisted until he filed papers seeking shared parenting in September 2009, as stated above, the trial court was in the best position to weigh the credibility of witness testimony. See *Seasons Coal*, supra.

{¶45} Additionally, although Shane argues that the trial court erred in finding the parties could not cooperate, Melanie testified that she and Shane did not cooperate together and did not speak, that Shane had violated a civil protection order she had obtained against him; that the parties had disagreements concerning the children's medical care; that the parties had disagreements concerning who could pick up the children from Epworth; and, that the parties had a confrontation while exchanging the children, necessitating that exchanges take place at the police station. Particularly given that it was in the best position to weigh the credibility of testimony, we cannot find that the trial court erred in finding that the parties had little ability to cooperate. See *Seasons Coal*, supra.

{¶46} Next, Shane argues that there was no evidence that he suffered from mental health issues. However, evidence was presented at the trial that the February 2005 judgment entry of Shane's conviction for falsification ordered him

to "comply with any/all doctors orders regarding his treatment for bipolar disorder." (Feb. 2005 Judgment Entry, p. 2). Additionally, Melanie testified that Shane's behavior improved when he was taking medication for his bipolar disorder. Although Shane testified that he had consulted another physician in late 2006 who took him off medication because he did not believe he had bipolar disorder, but was depressed due to his bad marriage, we note that this is yet another situation in which the trial court was in the best position to weigh credibility. See *Seasons Coal*, supra. Further, the trial court made no finding that Shane "suffered from mental health issues," but merely found that "father has previously been diagnosed with bi-polar disorder and treated for the disorder for a period of two years. Father sought a second opinion and was diagnosed with situational depression" (Feb. 2010 Judgment Entry, p. 6). We cannot find that the trial court erred in making this finding, as it was supported by the evidence.

{¶47} Next, Shane argues that Melanie's testimony about his refusal to seek proper medical treatment for the children was not credible and that there was no evidence the children suffered harm while in his care after the divorce. However, Melanie presented testimony that three of the children were injured in his care, and he refused to take them to the emergency room, but, instead, called her to come and pick up the children to take them to the emergency room. This is yet another issue of credibility.

{¶48} Next, Shane contends that Melanie's testimony that she was afraid of him and feared for the safety of the children while in his care was not credible, given that she voluntarily expanded his visitation in the past. However, as stated previously, Melanie testified that she only increased Shane's visitation because she was in school and could not care for the children at those times, so she was required to offer him expanded visitation under the right of first refusal because it was required by the original divorce decree.

{¶49} Next, Shane argues that any domestic violence concerns about him based on prior acts were known to Melanie at the time of the initial divorce hearing and could not be heard at this hearing on the principles of res judicata. Initially, we note that courts have held that the doctrine of res judicata should not be strictly applied in cases involving child custody and visitation matters. *Kelm v. Kelm*, 92 Ohio St.3d 223, 227, 2001-Ohio-168. Additionally, R.C. 3109.04(E)(1)(a), which governs findings of a change in circumstances, provides that, "The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree *or that were unknown to the court at the time of the prior decree*, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the

child." (emphasis added). Here, the trial court in its February 2010 judgment entry put the phrase "or that were unknown" in bold print, apparently emphasizing that the trial court could base its findings on facts that existed prior to the previous decree, but that were unknown to the court until the current action. Additionally, courts have found arguments similar to Shane's to be unpersuasive, on the basis that the plain language of the statute indicates that the phrase "based on facts that have arisen since the prior decree" refers to the determination of a change in circumstances, not to the determination of the best interests of the children. *Babel v. Babel*, 12th Dist. Nos. CA2005-05-104, CA2005-06-141, 2006-Ohio-4323, ¶¶24-28. Additionally, in *Babel*, the Twelfth Appellate District held that the factors courts consider when determining what is in the children's best interests "are not limited to events occurring after a prior order, and in fact, in order to properly assess these factors, a court must look at all events that affect the child's best interest." 2006-Ohio-4323, at ¶28. We agree with the foregoing, and find that evidence of prior domestic violence incidents was not barred by res judicata for purposes of determining the best interests of the children.

{¶50} Finally, Shane argues that the trial court should not have eliminated his right of first refusal, and, in the same vein, that the trial court should not have awarded Melanie parenting time beginning at 6:00 p.m. on Sundays, because the children would be in the custody of a third party until Melanie returned from work

at 8:30 p.m. However, Warren's report to the trial court recommended that the right of first refusal be eliminated because it was not in the best interests of the children given the history of conflict between the parties, and Melanie testified that she did not want Shane to have the right of first refusal because she had concerns about the children's safety. Given that the trial court's order was supported by ample evidence in the record, we cannot find that the trial court abused its discretion in eliminating Shane's right of first refusal and ending his parenting time at 6:00 p.m. on alternating Sundays.

{¶51} In conclusion, we reiterate that the trial court specifically found that the children had incurred various injuries while in Shane's care, with all but one of the children requiring emergency room care; that Shane's testimony about who took the children to the emergency room was not credible; that Shane had been convicted of domestic violence against a household member, Melanie's son from a prior relationship; that Shane had been convicted of violating a domestic violence civil protection order obtained by Melanie; that the parties had adjusted their visitation schedule over the years to accommodate their changing work schedules; and, that Melanie asserted she allowed Shane increased parenting time while she was attending school because she was required to under the right of first refusal, but that she did not want Shane to have the right of first refusal because she was worried about the children's safety while in his care. We find that the trial court's

findings were well-supported by the testimony heard at trial, and that the trial court did not err in concluding that decreasing Shane's parenting time and denying his motion for shared parenting was in the children's best interests. This is particularly so given the trial court's broad discretion in these matters, as well as its better position to weigh the credibility of witnesses and their testimony. Additionally, we conclude that the trial court's findings demonstrate it engaged in a meaningful, independent review of the evidence and appropriate analysis of the applicable statutory factors.

**{¶52}** Accordingly, we overrule Shane's first and second assignments of error.

*Assignment of Error No. III*

**{¶53}** In his third assignment of error, Shane argues that the trial court erred in imputing income to him at his prior rate of earning and increasing his child support obligation. Specifically, Shane contends that he had been terminated from his prior employment at Guardian due to poor sales; that he had been hired back to Guardian as an independent contractor, but had only earned $150 and $200 in the two months since becoming an independent contractor; that he had not yet secured employment in the insurance industry, so it was unfair to estimate that his income would be consistent with his prior earnings; and, that the trial court should

not have imputed income to him without first making a determination that he was voluntarily unemployed or underemployed pursuant to R.C. 3119.01(C)(11).

**{¶54}** It is well-established that a trial court's decision regarding child support obligations will not be disturbed on appeal absent an abuse of discretion. *Dreher v. Stevens*, 3d Dist. No. 4-05-20, 2006-Ohio-351, ¶19, citing *Booth v. Booth* (1989), 44 Ohio St.3d 142, 144; see also *Pendleton v. Pendleton*, 3d Dist. No. 5-06-38, 2007-Ohio-3834, ¶21 (a trial court has considerable discretion in calculating child support). A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. See *State v. Boles*, 2d Dist. No. 23037, 2010-Ohio-278, ¶¶17-18, citing Black's Law Dictionary (8 Ed.Rev.2004) 11. When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *Blakemore*, 5 Ohio St.3d at 219.

**{¶55}** R.C. 3119.79 governs modification of child support orders and provides, in pertinent part:

> **If an obligor or obligee under a child support order requests that the court modify the amount of support required to be paid pursuant to the child support order, the court shall recalculate the amount of support that would be required to be paid under the child support order in accordance with the schedule and the applicable worksheet through the line establishing the actual annual obligation. If that amount as recalculated is more than ten per cent greater than or more than ten per cent less than the amount of child support required to be paid pursuant to the existing child support order, the deviation from the recalculated**

**amount that would be required to be paid under the schedule and the applicable worksheet shall be considered by the court as a change of circumstance substantial enough to require a modification of the child support amount.**

R.C. 3119.79(A). In determining the proper amount of child support to be paid,

R.C. 3119.01(C)(5) provides, in pertinent part, that:

**(5) "Income" means either of the following:**

**(a) For a parent who is employed to full capacity, the gross income of the parent;**

**(b) For a parent who is unemployed or underemployed, the sum of the gross income of the parent and any potential income of the parent.**

**{¶56}** A determination of "potential income" under R.C. 3119.01(C)(11), requires the trial court to first find that the parent is voluntarily unemployed or underemployed before it may impute income for child support calculation purposes. See *Smart v. Smart*, 3d Dist. No. 17-07-10, 2008-Ohio-1996, ¶21, citing *Rock v. Cabral* (1993), 67 Ohio St.3d 108.

**{¶57}** Here, the trial court in its judgment entry stated the following in addressing Shane's child support obligation, in pertinent part:

**Father has recently been terminated from a salaried employment and is working on a contract basis. Father indicates that he will be starting a new career in insurance and anticipates income at his prior rate. The Court assigns his prior rate of $32,700.00 as his income.**

(Feb. 2010 Judgment Entry, p. 8). The judgment entry contained no finding that Shane was voluntarily unemployed or underemployed, or anything insinuating the trial court made such a finding. See *O'Connor v. O'Connor*, 184 Ohio App.3d 538, 2009-Ohio-5436, ¶11 (finding imputation of income permissible where the reviewing court can glean from the record the trial court's finding of voluntary unemployment or underemployment, even where not explicitly stated). Accordingly, we presume the trial court's assigning of Shane's previous income of $32,700 was not based on an "imputed" income under R.C. 3119.01(C)(11), but was instead based on Shane's and his fiancée's testimony that Shane had made $27,349 in 2009; that he had been terminated from his position and rehired by his previous employer as an independent contractor; that his income had decreased due to his termination; that he was "getting ready to start a new job" in the insurance industry; and, that he "expected" to make an income comparable to his previous job in the security industry. We cannot find that this very speculative testimony supported a finding that Shane's gross income was $32,700. Although the trial court may have believed Shane was voluntarily underemployed and capable of making that amount, there is no indication in its judgment entry that the trial court made such a finding. Consequently, we find that the trial court's calculation constituted an abuse of discretion.

**{¶58}** Accordingly, we sustain Shane's third assignment of error and reverse and remand on this matter for further proceedings consistent with this opinion.

**{¶59}** Having found no error prejudicial to the appellant herein, in the particulars assigned and argued in the first and second assignments of error, but having found error prejudicial to the appellant, in the particulars assigned and argued in the third assignment of error, we affirm in part, and reverse in part, the judgment of the trial court, and remand for further proceedings on the matter of child support consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**WILLAMOWSKI, P.J. and PRESTON, J., concur.**

**/jlr**