[Cite as *Drummer v. Drummer*, 2012-Ohio-3064.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PUTNAM COUNTY

WILLIAM DRUMMER,

    PLAINTIFF-APPELLANT/
    CROSS-APPELLEE,                  CASE NO. 12-11-10

    v.

SHIRLEY DRUMMER,               O P I N I O N

    DEFENDANT-APPELLEE/
    CROSS-APPELLANT.

Appeal from Putnam County Common Pleas Court
Domestic Relations Division
Trial Court No. 2010 DIV 00146

Judgment Affirmed

Date of Decision: July 2, 2012

APPEARANCES:

    *Joseph R. Burkard* for Appellant/Cross-Appellee

    *Matthew A. Cunningham* for Appellee/Cross-Appellant

**ROGERS, J.**

{¶1} Plaintiff-Appellant/Cross-Appellee, William Drummer, appeals the judgment of the Court of Common Pleas of Putnam County, Domestic Relations Division, granting his complaint for divorce and Defendant-Appellee/Cross-Appellant's, Shirley Drummer, counterclaim for divorce. On appeal, William contends that the trial court erred in finding that the equity in their residence, located at 21023 State Route 15, Continental, Ohio, ("marital residence") is marital property; that the trial court erred in determining that the 955 John Deere tractor, including accessories, ("tractor") is marital property; and, that the trial court abused its discretion by imputing minimum wage to him for purposes of calculating child support. In her cross-appeal, Shirley contends that the trial court erred when it did not find the existence of a common law marriage between her and William; that the trial court erred by not analyzing R.C. 3105.171(A)(2)(b) for purposes of property division; and, that the trial court erred in determining that the marital portion of William's pension was 144 months and not 214 months. Based on the following, we affirm the judgment of the trial court.

{¶2} William and Shirley married on July 28, 1994, and have one minor child born as issue of the marriage. In June 2010, William filed a complaint for divorce. In September 2010, Shirley filed a counterclaim for divorce.

{¶3} In May 2011, the matter proceeded to a hearing. During the hearing, William and Shirley, each represented by counsel, informed the trial court that they had reached an agreement as to the division of some, but not all, property, and that Shirley will be the residential parent of their minor child. During the remainder of the hearing, William and Shirley presented evidence on the following disputed issues: whether the equity in the marital residence is marital property; whether the tractor is marital property; the portion of William's pension that is marital property; and, the existence of a common law marriage prior to the date of their marriage.

{¶4} In June 2011, the trial court determined, in relevant part, that the equity in the residence was marital property, that the tractor was marital property, that Shirley did not present clear and convincing evidence that a common law marriage existed, and that child support would "be calculated based upon imputed minimum wage income to each of the parties in addition to those amounts previously ordered as pension distributions." June 21, 2011 Decision, p. 7. Thereafter, in August 2011, the trial court entered the divorce decree.

{¶5} It is from this judgment William and Shirley appeal, presenting the following assignments of error for our review.

Case No. 12-11-10

*William's Assignments of Error*

*Assignment of Error No. I*

**THE TRIAL COURT AWARDING APPELLEE EQUITY IN THE PRE-MARITAL HOME LOCATED AT 21023 ST. RT. 15, CONTINENTAL, OHIO IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Assignment of Error No. II*

**THE TRIAL COURT AWARDING APPELLEE EQUITY IN THE PRE-MARITAL 955 JOHN DEERE TRACTOR AND ACCESSORIES IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Assignment of Error No. III*

**THE TRIAL COURT ABUSED ITS DISCRETION BY IMPUTING MINIMUM WAGE ON THE APPELLANT IN ADDITION TO USING HIS RETIREMENT INCOME CALCULATING CHILD SUPPORT.**

*Shirley's Assignments of Error*[1]

*Assignment of Error No. I*

**THE TRIAL COURT COMMITTED ERROR BY NOT RECOGNIZING THE VALIDITY OF A COMMON LAW MARRIAGE ESTABLISHED BEFORE OCTOBER 1991.**

*Assignment of Error No. II*

---

[1] Upon review, we note that the text in Shirley's brief does not comply with the spacing requirement set forth in App.R. 19(A), which requires "double spacing between each line of text except quoted matter which shall be single spaced."

-4-

**THE TRIAL COURT COMMITTED ERROR BY NOT ANALYZING R.C. 3105.171(A)(2)(b) FOR PURPOSES OF PROPERTY DIVISION.**

*Assignment of Error No. III*

**THE TRIAL COURT ERRED BY DETERMINING THAT THE MARITAL PORTION OF HUSBAND'S PENSION WAS 144 MONTHS AND NOT 214 MONTHS.**

*William's Assignments of Error Nos. I & II*

{¶6} In his first assignment of error, William contends that the trial court erred in finding that the equity in the marital residence is marital property. In his second assignment of error, William contends that the trial court erred in finding that the tractor is marital property. Additionally, William contends that the trial court erred by not supporting its classification of the marital residence and tractor with written findings of fact. Based on the following, we disagree.

{¶7} "In determining whether the trial court has appropriately categorized property as separate or marital, the standard of review is whether the classification is against the manifest weight of the evidence." *Eggeman v. Eggeman*, 3d Dist. No. 2-04-06, 2004-Ohio-6050, ¶ 14, citing *Henderson v. Henderson*, 3d Dist. No. 10-01-17, 2002-Ohio-2720, ¶ 28. "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Const. Co.*, 54 Ohio St.2d 279 (1978),

syllabus. When reviewing a judgment under a manifest-weight-of-the-evidence standard, a court has an obligation to presume that the findings of the trier of fact are correct. *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 79-80 (1984). Mere disagreement over the credibility of witnesses or evidence is not sufficient reason to reverse a judgment. *State v. Wilson*, 113 Ohio St.3d 382, 387, 2007-Ohio-2202, ¶ 40.

{¶8} "In a divorce proceeding, the trial court must determine whether property is marital or separate property." *Reed v. Reed*, 3d Dist. No. 1-09-63, 2010-Ohio-4550, ¶ 8, citing *Gibson v. Gibson*, 3d Dist. No. 9-07-06, 2007-Ohio-6965, ¶ 29.

{¶9} Marital property includes, in relevant part:

(i)    All real and personal property that currently is owned by either or both of the spouses, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;

(ii)   All interest that either or both of the spouses currently has in any real or personal property, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;

(iii) Except as otherwise provided in this section, all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage;  R.C. 3105.171(A)(3)(a).

Separate property includes, in relevant part:

(ii) Any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage;

(iii) Passive income and appreciation acquired from separate property by one spouse during the marriage; R.C. 3105.171(A)(6)(a).

Furthermore, "[t]he commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable."  R.C. 3105.171(A)(6)(b). Accordingly, traceability is the key to determining whether separate property has lost its separate character after being commingled with marital property.  *Ward v. Ward*, 3d Dist. No. 1-03-63, 2004-Ohio-1390, ¶ 4, citing *Peck v. Peck*, 96 Ohio App.3d 731, 734 (12th Dist. 1994).  The party seeking to have a particular asset classified as separate property has the burden of proof, by a preponderance of the evidence, to trace the asset to separate property.  *Id.*

*Marital Residence*

{¶10} William contends that that the trial court erred in finding that the equity in the marital residence is marital property.  Specifically, William contends that the equity in the marital residence is separate property because it was purchased prior to the marriage, and because its increased value is the result of passive appreciation.  We disagree.

{¶11} In 1988, William purchased the marital residence for the sum of $60,000.00. William financed the purchase by making a $6,000.00 down payment and securing a $54,000.00 mortgage in his name. The parties stipulated that the $6,000.00 down payment was William's separate property. Shirley testified that she moved into the residence in August 1988 and resided there on a permanent basis until April 2010. William, on the other hand, testified that Shirley began residing at the marital residence on a permanent basis beginning in 1990, and that prior to that time she resided at the marital residence on an intermittent basis. Shirley testified that in 1988 William added her as a joint holder to his pre-existing checking account. Shirley explained that she and William deposited their respective income into that checking account and that the funds in the account were used to pay household expenses. William did not contest the existence of the checking account, but testified that Shirley's income primarily financed groceries. William further testified that the only improvements made on the marital residence were the addition of a paved driveway and a new roof. Though William could not recall the exact dates those improvements were made, he did testify that the paved driveway was likely added in 1995. Also in 1995, the original mortgage on the marital residence was paid off via the joint contributions of William and Shirley. That same year, William and Shirley took a second mortgage out on the marital residence. Both William and Shirley's names appeared on the mortgage

instrument. In 2008, William and Shirley took a third mortgage out on the marital residence. Again, Both William and Shirley's names appeared on the mortgage instrument. During the hearing, the parties stipulated that the marital residence was valued at $111,000.00, and that the mortgage payoff amount was $42,000.00.

{¶12} Though the marital residence was purchased several years prior to the marriage, and thus was acquired as separate property, *See* R.C. 3105.171(A)(6)(a)(ii), there was sufficient competent, credible evidence that payment of, maintenance on, and improvements to the marital residence were accomplished through William *and* Shirley's efforts. In particular, there was evidence that household expenses were paid out of a joint checking account in which Shirley and William deposited funds, that Shirley helped William pay off the original mortgage, and that Shirley was jointly liable for mortgages taken out on the marital residence in 1995 and 2008. Given the foregoing, it was reasonable for the trial court to conclude that what began as separate property transformed into marital property as a result of William and Shirley's joint contributions prior to and during the marriage. Furthermore, with the exception of the $6,000.00 down payment, William presented no evidence tracing the funds used to pay off, maintain, and improve the marital residence to his separate property. Accordingly, William failed to establish that the equity in the marital residence, with exception of $6,000.00, is his separate property.

{¶13} William also contends that the increased value of the marital residence is the result of passive appreciation, and thus constitutes separate property. We disagree.

{¶14} Passive appreciation will only be separate property if the property at issue is separate. *See* R.C. 3105.171(A)(6)(a)(iii). Here, we have already determined that the marital residence, which began as separate property, was transformed into marital property as a result of the Shirley's contributions in paying off, maintaining, and improving the residence prior to and during the marriage. Consequently, even if the increased value of the marital residence was the result of passive appreciation it would be marital property.[2]

{¶15} Given the foregoing, we find that the trial court's classification of the equity in the marital residence as marital property was not against the manifest weight of the evidence.

*Tractor*

{¶16} Next, William contends that the tractor is separate property, as it was acquired by him prior to the date of the marriage. We disagree.

{¶17} Considering the evidence presented during the hearing, there were two dates on which the tractor could have been purchased. William testified, and

---

[2] Contrary to William's contention, the record contains no evidence that the increased value of the marital residence resulted from passive appreciation. Instead, the record, particularly William's testimony concerning the addition of a paved driveway and new roof, supports the conclusion that the increased value of the marital residence resulted from active appreciation.

consequently argued, that he purchased the tractor in October 1993 and financed it via an eleven-month installment contract. Though William was unable to produce a bill of sale for the tractor, he did introduce a facsimile, purportedly sent by the retailer from whom William purchased the tractor, stating that William purchased the tractor in October 1993. Shirley, on the other hand, argued that William purchased the tractor sometime after November 1994, i.e., after their marriage. In support, Shirley cites William's testimony that he hauled the tractor home with a 1994 K1500 Chevrolet truck ("truck"). Shirley then introduced a retail installment contract for the same truck, which stated that the truck was purchased in November 1994.

{¶18} Given the foregoing, there was competent, credible evidence supporting the purchase date asserted by each party. William's testimony that he purchased the tractor in October 1993 was corroborated by a facsimile purportedly sent by the retailer from whom William purchased the tractor. However, the fact that William could only corroborate his testimony with a facsimile may cause a reasonable trier of fact to question William's asserted purchase date. On the other hand, the evidence supporting Shirley's asserted purchase date of the tractor is arguably less dubious. Unlike William, Shirley was able to produce a retail installment contract, dated after the marriage, for the truck William admittedly used to haul the tractor home. Faced with this evidence, it was reasonable for the

trial court to conclude that the tractor was purchased after the marriage. Accordingly, we find that the trial court's classification of the tractor as marital property was not against the manifest weight of the evidence.

*Written Findings of Fact*

{¶19} Last, William contends that the trial court erred by not supporting its categorization of the marital residence and tractor with written findings of fact. We disagree.

{¶20} Though written findings of fact would undoubtedly be helpful in determining whether the trial court erred in classifying property as separate or marital, such findings are not required by statute. *Oliver v. Oliver*, 12th Dist. No. CA2011-01-004, 2011-Ohio-6345, ¶ 10. R.C. 3105.171 only requires written findings of fact in two situations, both of which deal with the distribution of property that has already been classified as marital or separate. *See* R.C. 3105.171(D), (G). Because William's contentions on appeal are limited to the classification of the marital residence and tractor as marital property and not the distribution thereof, none of R.C. 3105.171's provisions requiring written findings of fact apply in the instant case. Therefore, the absence of written findings of fact supporting the trial court's classification of the marital residence and tractor as marital property does not constitute error.

{¶21} Accordingly, we overrule William's first and second assignments of error.

*William's Assignment of Error No. III*

{¶22} In his third assignment of error, William contends that the trial court erred when it imputed minimum wage income to him for purposes of calculating child support. William's contention is two-fold. First, William contends that the trial court erred when it failed to expressly find that he was voluntarily unemployed or underemployed. Second, William contends that his retirement precludes a finding that he was voluntarily unemployed. Based on the following, we disagree.

{¶23} It is well established that a trial court's decision regarding child support obligations will not be disturbed on appeal absent an abuse of discretion. *Dreher v. Stevens*, 3d Dist. No. 4-05-20, 2006-Ohio-351, ¶ 19, citing *Booth v. Booth*, 44 Ohio St.3d 142, 144 (1989). A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *See State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, ¶ 17-18, citing *Black's Law Dictionary* 11 (8th Ed.Rev.2004). When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶24}** Before computing child support, the trial court must determine each parent's income. *See Thacker v. Thacker*, 3d Dist. No. 9-10-26, 2010-Ohio-5675, ¶ 55. Where the calculation of child support involves a parent who is unemployed or underemployed, the trial court must consider the parent's gross income and, relevant to the instant case, the parent's potential income, R.C. 3119.01(C)(5)(b), which is income the parent would have earned if he or she had been fully employed. R.C. 3119.01(C)(11)(a). In determining the parent's potential income and whether it may impute that income, the trial court must engage in a two-part analysis. *Theurer v. Foster-Theurer*, 12th Dist. Nos. CA2008-06-074, CA2008-06-083, 2009-Ohio-1457, ¶ 83, citing *Badovick v. Badovick*, 128 Ohio App.3d 18, 23 (8th Dist. 1998). First, the trial court must determine whether the parent is voluntarily unemployed or underemployed. *Id.*; *see also Smart v. Smart*, 3d Dist. No. 17-07-10, 2008-Ohio-1996, ¶ 21. If the trial court determines that the parent is voluntarily unemployed or underemployed, then the potential income to be imputed to the parent must be determined in accordance with the factors enumerated under R.C. 3119.01(C)(11)(a). *Theurer* at ¶ 83.

**{¶25}** As an initial matter, we note that William's contention is limited to the finding that he was voluntarily unemployed or underemployed. William advances no arguments challenging the amount of imputed income. Accordingly,

our review is limited to determining whether the trial court abused its discretion in finding that William was voluntarily unemployed or underemployed.

**{¶26}** Bearing this in mind, we begin with the trial court's order addressing William's child support obligation, which reads, in relevant part:

> [c]hild support shall be calculated based upon imputed minimum wage income to each of the parties in addition to those amounts previously ordered as pension distributions. June 21, 2011 Decision, p. 7.

**{¶27}** First, William contends that the trial court committed reversible error when it did not expressly find that he was either voluntarily unemployed or underemployed. Though the better practice would be to expressly find that the parent is voluntarily unemployed or underemployed, we disagree with William's contention in light of this court's precedent in *O'Connor v. O'Connor*, 184 Ohio App.3d 538, 2009-Ohio-5436 (3d Dist.). In *O'Connor*, the trial court did not expressly find that the parent was voluntarily unemployed or underemployed for purposes of imputing potential income to the parent. Nevertheless, this court explained that the absence of an express finding of voluntary unemployment or underemployment is not reversible error where a reviewing court is capable of inferring such a finding from the record. *O'Connor* at ¶ 11; *see also Wheeler v. Wheeler*, 6th Dist. No. OT-04-025, 2005-Ohio-1025, ¶ 26 (no statutory requirement that the trial court's finding concerning voluntary unemployment or

-15-

underemployment be express); *but see Collins v. Collins*, 9th Dist. No. 10CA0004, 2011-Ohio-2087, ¶ 36 (trial court's finding concerning voluntary unemployment or underemployment must be express).

{¶28} Here, the record contains evidence that is relevant in determining whether William was voluntarily unemployed or underemployed. William began working at GM in 1978. Shortly thereafter, in 1979, William suffered serious injury to one of his ankles while riding a snowmobile. William explained that his ankle continues to bother him, especially when he stands for a long period of time. Because his position at GM required him to stand for a long period of time, William testified that his ankle often hurt during work. William testified that he accepted early retirement due to the pain in his ankle. William, however, explained that had he not been offered early retirement he would have continued working for GM. Since retiring, William has, on a periodic basis, worked as an independent contractor installing television satellite dishes. In 2010, William earned $220.00 installing satellite dishes. Given the foregoing, we find that there is sufficient evidence for us to infer that the trial court determined that William was voluntarily unemployed.[3]

---

[3] Though the trial court did not expressly find that William was voluntarily unemployed or underemployed, we will, for purposes of discussion, say that William is voluntarily unemployed. Ultimately, though, the terminology is inconsequential.

{¶29} Next, we consider William's contention that his retirement precludes a finding that he is voluntarily unemployed.

{¶30} First, William's contention is lacking in both argument and supportive authority. *See* App.R. 12(A)(2), App.R. 16(A)(7). Due to the lack of argument and authority, William has failed to convince us that his retirement precludes a finding that he is voluntarily unemployed.

{¶31} Notwithstanding the lack of argument and authority, we find that retirement does not per se preclude a finding that a parent is voluntarily unemployed or underemployed. First, we are unaware of any provision in R.C. Chapter 3119 that precludes a finding that a parent is voluntarily unemployed or underemployed simply because he or she is retired. Second, we are unaware of any case that has held that retirement alone precludes a finding that a parent is voluntarily unemployed or underemployed. Rather, determining whether a parent is voluntarily unemployed or underemployed is a matter to be determined by the trial court based upon the facts and circumstances of each case. *Rock v. Cabral*, 67 Ohio St.3d 108, 112 (1993); *see also Combs v. Combs*, 12th Dist. No. CA2001-11-102, 2003-Ohio-198, *Justinger v. Schlegel*, 3d Dist. No. 11-97-03 (July 15, 1997).

{¶32} In *Combs*, the parent, who had worked for his employer for thirty-four years and earned a yearly salary of $97,000.00, retired to avoid disciplinary

-17-

charges and possible termination. After retirement, the parent obtained part-time employment earning $10.00 per hour. The parent filed a motion to modify his child support obligation as a result of his reduced income. The trial court denied the parent's motion to modify finding that the parent's retirement constituted voluntary underemployment. On appeal, the court of appeals found that despite the anticipated disciplinary charges and possible termination, the parent's decision to retire was ultimately a voluntary decision. Accordingly, the court of appeals concluded that the trial court did not abuse its discretion in finding that the parent was voluntarily underemployed.

{¶33} In *Justinger*,[4] the parent retired at the age of forty-seven having earned an average income of $65,000.00 during the last three years of his employment.[5] Though the exact reason for the parent's retirement was unclear, the facts established that the parent did not retire due to his age or disability. After retirement, the parent did not obtain any employment and thus his yearly income was limited to retirement income, which amounted to $25,320.00. The parent filed a motion to modify his child support obligation as a result of his reduced income. The trial court denied the parent's motion to modify finding that he was voluntarily unemployed and imputed a potential income to him of $40,505.00,

---

[4] At the time *Justinger* was decided, R.C. 3113.215 governed child support. R.C. 3113.215 was repealed on March 22, 2001, and was replaced by R.C. 3119.01, which is comparable to the provisions of R.C. 3113.215 and does not vary in any way that affects our current analysis.
[5] This figure represented the parent's base salary, overtime, and bonuses.

which represented his pre-retirement base salary. On appeal, this court found that the parent was voluntarily unemployed because he "reduced his income when he was not forced to do so by circumstances beyond his control." *Justinger* at *1. Accordingly, this court concluded that the trial court did not abuse its discretion in finding that the parent was voluntarily unemployed.

**{¶34}** Here, we find that there is sufficient evidence supporting the trial court's finding that William is voluntarily unemployed. William testified that his primary reason for accepting early retirement was that prolonged standing at work "really bothered" the ankle he injured in 1979. Though William testified that he decided to accept early retirement because of his ankle, the fact remains that William worked at GM for nearly 27 years after injuring his ankle. Considering the length of time William worked on his bothersome ankle, it is reasonable to conclude that William's ankle was merely a factor in his otherwise voluntary decision to retire. This conclusion is supported by William's testimony that he would have continued working at GM had he not been offered early retirement. Bearing this in mind, and the fact that there was no evidence that William was incapable of securing gainful employment after retirement, we find that the trial court did not abuse its discretion in finding that William was voluntarily unemployed.

**{¶35}** Accordingly, we overrule William's third assignment of error.

*Shirley's Assignment of Error No. I*

**{¶36}** In her first assignment of error, Shirley contends that the trial court erred in determining that she failed to establish the existence of a common law marriage. Specifically, Shirley contends that she offered evidence that clearly and convincingly established that she and William had been in a common law marriage since October 1988. Based on the following, we disagree.

**{¶37}** In reviewing the trial court's decision concerning the existence of a common law marriage, the standard of review is whether the decision was against the manifest weight of the evidence. *In re Estate of Shepherd*, 97 Ohio App.3d 280, 283 (3d Dist. 1994). As previously mentioned, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. *C.E. Morris Co.*, 54 Ohio St.2d at syllabus. When reviewing a judgment under a manifest-weight-of-the-evidence standard, a court has an obligation to presume that the findings of the trier of fact are correct. *Seasons Coal Co., Inc.*, 10 Ohio St.3d at 79-80. Mere disagreement over the credibility of witnesses or evidence is not sufficient reason to reverse a judgment. *Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, at ¶ 40.

**{¶38}** We begin by noting that common law marriages have never been favored in Ohio. *Nestor v. Nestor*, 15 Ohio St.3d 143, 145 (1984). In fact,

common law marriages occurring after October 10, 1991, are not recognized in Ohio. R.C 3105.12(B)(1). However, relationships between a man and woman that attained common law marriage status prior to October 10, 1991 are recognized as valid and remain valid until terminated by death, dissolution, divorce, or annulment. R.C. 3105.12(B)(2).

{¶39} In order to establish the existence of a common law marriage, the party alleging a common law marriage must establish each of the following elements by clear and convincing evidence: (1) an agreement to marry in praesenti by parties competent to contract; (2) cohabitation as husband and wife; (3) the parties must hold themselves out as husband and wife; and, (4) the parties are treated and reputed as husband and wife by the community. *See Nestor* at 145.

{¶40} The first element of the test, a meeting of the minds to marry in praesenti, is the essential element of a common law marriage. *Id*. at 146. "Its absence precludes the establishment of such a relationship even though the parties live together and openly engage in cohabitation." *Id*. An agreement to marry in praesenti may be proven either by direct evidence which establishes agreement, or by proof of cohabitation, acts, declarations, and conduct of the parties and their recognized status in the community in which they reside. *Id*. "Where there is no direct proof in reference to the formation of the contract of marriage *in praesenti,* testimony regarding cohabitation and community reputation tends to raise an

-21-

inference of the marriage. This inference is given more or less strength according to the circumstances of the particular case. The inference is generally strengthened with the lapse of time during which the parties are living together and cohabitating as man and wife." *Id.*

{¶41} As for the final two elements,[6] the Supreme Court of Ohio explained that, "in order to establish a common law marriage it is not necessary that [the man and woman] disseminate information to all society generally, or to all of the community in which they reside. Rather, there must be a holding out to those with whom they normally come in contact. A common law marriage will not necessarily be defeated by the fact that all persons in the community within which the parties reside are not aware of the marital arrangement, nor by the fact that all persons with whom they normally come in contact are also unaware of the arrangement." *Id.*

{¶42} Although there was no written agreement to marry in praesenti, Shirley cites three excerpts from the hearing contending that they represent direct evidence that William considered Shirley as his wife prior to their marriage. The first excerpt Shirley cites reads:

---

[6] On appeal, William does not challenge the existence of the second element, i.e., cohabitation. Accordingly, there is no need to discuss that element in this opinion.

Q: And during, * * * this time between 1988 and 1994, you and Shirley went ahead and bought personal property and other items together; is that correct?

A: Yes.

Q: Okay. So every decision that was made whether to buy something was you did it jointly between you and her?

A: Most of the time, not always. Hearing Tr., p. 18-19.

The second excerpt Shirley cites reads:

Q: All right. And from * * * October of 1988 until '94, you and Shirley were a couple and you were making marital decisions together; is that right?

A: In our eyes probably would have been maybe considered a couple; but, however, with the community, they, nobody knowed (sic) we was married or everybody knowed (sic) we wasn't married. Hearing Tr., p. 20.

The last excerpt Shirley cites reads:

Q: We've heard some testimony here today and I think Mr. Cunningham has asked you some questions about the time frame between 1989 and '94 and about holding yourself out [as] being married. Did you consider yourself married to Shirley Drummer during that period of time?

A: We was very close, yes. Hearing Tr., p. 120.

Upon consideration of the foregoing testimony, we are not convinced that William's responses constitute direct evidence of an agreement to marry in praesenti. At best, the testimony demonstrates that William and Shirley were a

close couple, but not husband and wife. Moreover, William testified that there was no agreement to be or get married.

> Q: All right. Now, when you and Shirley moved in together at the State Route 15 house in 1988, you two were in agreement to getting married; is that correct?
>
> A: I would say that was definitely not true, no.
>
> Q: And at that time * * * for those years of 1989, 1990, 1991, 1992, 1993, your attitude toward marriage was that you two were already married. Is that right?
>
> A: No. Hearing Tr., p. 17.

Based on William's testimony and the fact that there was no written agreement to be married in praesenti, we, like the trial court, find that Shirley did not establish the existence of an agreement to marry in praesenti via direct evidence.

{¶43} Notwithstanding the absence of direct evidence of an agreement to marry in praesenti, Shirley contends that the first common law marriage element is met via the parties' cohabitation, acts, declarations, conduct, and their recognized status in the community in which they resided. *See Nestor*, 15 Ohio St.3d at 146. In particular, Shirley highlights the following evidence: the establishment of joint checking account in October 1988; joint contribution to household expenses; filing joint tax returns with William from 1988 through 1994; her designation as

beneficiary of William's life insurance policy in 1988; and, their many years of cohabitation prior to the marriage.

{¶44} While the things highlighted by Shirley may arguably be indicative of an agreement to marry in praesenti, many of these things are also common among unmarried couples. For instance, it is not uncommon for unmarried couples to cohabitate, have a joint checking account, and jointly contribute to household expenses. However, one thing that a married couple can do that an unmarried coupled cannot is file a joint federal tax return. Consequently, an unmarried couple filing joint tax returns, while not legally appropriate, may be more indicative of a shared intent to be married than other activities. Here, Shirley testified that she and William have filed joint federal tax returns since 1988. William, however, denied filing joint tax returns prior to their marriage, and Shirley was unable to produce tax returns for the years 1988, 1989, 1990, 1991, 1992, and 1993. Without these tax returns it is reasonable to find that Shirley did not provide clear and convincing evidence that she and William filed jointly prior to their marriage. Given the foregoing, we find that the trial court did not err in finding that the first common law marriage element was not established by clear and convincing evidence.

{¶45} Assuming, arguendo, Shirley established the first common law marriage element, we find that she failed to establish the final two elements by clear and convincing evidence.

{¶46} The trial court heard little testimony relevant to the final two common law marriage elements. Shirley testified that she introduced William as her husband and that he introduced her as his wife prior to their marriage. Shirley also testified that their families and friends viewed them as a married couple prior to their marriage. In support, Shirley called her cousin, Jackie Killion ("Killion"), to testify. Killion testified that she thought William and Shirley were married prior to moving into the marital residence. Killion explained that she assumed William and Shirley were married because she always saw them together and they lived together. William, on the other hand, testified that he never told anyone that he was married to Shirley prior to their marriage. Coincidently, Killion testified that William and Shirley never told her that they were married. Finally, William testified that neighbors, friends, and family did not view him and Shirley as husband and wife prior to their marriage.

{¶47} Clearly, the trial court was presented with conflicting testimony. It is evident that the trial court determined that Shirley did not present clear and convincing evidence establishing the final two common law marriage elements. There was competent, credible testimony that William and Shirley did not hold

themselves out as husband and wife and the community did not view William and Shirley as husband and wife. Because the trial court was in the best position to weigh the credibility of the testimony, we find that the trial court's decision was not against the manifest weight of the evidence.

{¶48} Accordingly, we overrule Shirley's first assignment of error.

*Shirley's Assignment of Error No. II*

{¶49} In her second assignment of error, Shirley contends that the trial court erred when it did not find, for purposes of property division, that the equitable beginning date of the marriage was October 1988. Based on the following, we disagree.

{¶50} A trial court's decision to select beginning and termination dates of a marriage other than those provided for in R.C. 3105.171(A)(2)(a) is a question of fact and will not be disturbed on appeal absent an abuse of discretion. *Renz v. Renz*, 12th Dist. No. CA2010-05-034, 2011-Ohio-1634, ¶ 7. As previously mentioned, a trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *See Boles*, 2d Dist. No. 23037, 2010-Ohio-278, at ¶ 17-18, citing *Black's Law Dictionary* 11 (8th Ed.Rev.2004). When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *Blakemore*, 5 Ohio St.3d at 219.

**{¶51}** There is a statutory presumption that the duration of a marriage runs from the date of the marriage through the date of the final divorce hearing. R.C. 3105.171(A)(2)(a). However, if the trial court determines that "the use of either or both of the dates * * * would be inequitable, the court may select dates that it considers equitable in determining marital property." R.C. 3105.171(A)(2)(b).

**{¶52}** Shirley contends that this court should follow the holding in *Bradley v. Bradley*, 8th Dist. No. 78400 (July 5, 2001). In *Bradley*, the parties became romantically involved in 1979, which resulted in the birth of their son in 1980. After the birth of their son, Mrs. Bradley remained at home to raise the parties' son instead of pursuing gainful employment. On June 22, 1991, the parties had a ceremonial marriage, but never obtained a marriage license. In 1995, Mrs. Bradley filed for divorce. Based on the evidence adduced during trial, the trial court determined that the parties were married at common law on June 22, 1991, and that the duration of the marriage spanned from 1979 to 1995. Mr. Bradley appealed the trial court's decision. On appeal, the court of appeals, noting the trial court's broad discretion on the matter, focused on length of time the parties had been together and the fact that Mrs. Bradley was financially dependent on Mr. Bradley. Based on these facts, the court of appeals determined that the trial court did not abuse its discretion.

{¶53} Having considered *Bradley*, we find that it is distinguishable from the present case. In *Bradley*, the parties cohabitated for approximately thirteen years before their common law marriage. Here, William and Shirley cohabitated for approximately six years. In *Bradley*, the parties had a son shortly after they began a relationship and well before their common law marriage. Here, William and Shirley had their first and only child in 1998, nearly four years after their marriage. Last, Mrs. Bradley was financially dependent on Mr. Bradley because she stayed home to raise their son. Here, Shirley was gainfully employed at Taco Bell between 1988 and 1995, and there was no evidence that she was financially dependent on William to the degree Mrs. Bradley was financially dependent on Mr. Bradley. Given these differences, we decline to follow *Bradley*.

{¶54} Certainly, the record in the instant case contains evidence that could persuade a trial court that, for purposes of property division, the beginning date of the marriage was prior to July 1994. However, the trial court did not reach that conclusion, finding that William and Shirley married on July 28, 1994. Having considered the record and being mindful of the trial court's broad discretion in determining whether the beginning and ending dates of the marriage are inequitable, we find that the trial court did not abuse its discretion when it did not select October 1988 as the equitable beginning date of the marriage.

{¶55} Accordingly, we overrule Shirley's second assignment of error.

*Shirley's Assignment of Error No. III*

{¶56} In her third assignment of error, Shirley contends that the trial court erred in finding that the marital portion of William's pension was 144 months and not 214 months. Based on the following, we disagree.

{¶57} In light of our disposition of Shirley's first and second assignments of error, we find that the trial court did not err in classifying only 144 months of William's pension as marital property. Shirley's figure of 214 months represents the number of months between the date Shirley contends is the first month of their marriage, October 1988, and the final month of William's employment at GM, July 2006. Consequently, the success of Shirley's third assignment of error depends on whether we sustained either her first or second assignments of error, in which she argued that October 1988 should be considered the first month of the marriage. Since we overruled Shirley's first and second assignments of error, it follows that the trial court did not err in classifying only 144 months of William's pension as marital property.

{¶58} Accordingly, we overrule Shirley's third assignment of error.

{¶59} Having found no error prejudicial to William or Shirley herein, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**PRESTON and WILLAMOWSKI, J.J., concur.**