[Cite as *August v. August*, 2014-Ohio-3986.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

KEHLY N. AUGUST,

    PLAINTIFF-APPELLANT,                CASE NO.  5-13-26

    v.

JOSHUA D. AUGUST,                     O P I N I O N

    DEFENDANT-APPELLEE.

Appeal from Hancock County Common Pleas Court
Domestic Relations Division
Trial Court No. 2011 DR 411

**Judgment Affirmed**

Date of Decision:  September 15, 2014

APPEARANCES:

    *Bruce B. Stevens* **for Appellant**

    *Garth W. Brown* **for Appellee**

**WILLAMOWSKI, P.J.**

{¶1} Plaintiff-appellant Kehly N. August ("Kehly") brings this appeal from the judgment of the Common Pleas Court in Hancock County, Ohio, Domestic Relations Division, granting a divorce from Defendant-appellee, Joshua D. August ("Joshua"), allocating parental rights and responsibilities over their minor child, ordering Kehly to pay child support, and finalizing the parties' property division. On appeal, Kehly contends that the trial court committed multiple errors and demands reversal of the trial court's judgment. For the reasons that follow, we affirm.

*Facts and Procedural History*

{¶2} Joshua and Kehly were married on April 13, 2003. They have one minor child, B.A., who was born during the parties' marriage and was less than two years old when the parties separated in August 2011. Joshua and Kehly lived in their marital home in Arlington, Ohio, until their separation. Joshua's mother provided day care for B.A. while Joshua and Kehly were at work. Joshua's parents have been very involved in B.A.'s life. B.A. is also close with many members of Joshua's large extended family, many of whom live in the area and meet regularly for family activities. Kehly does not have an active relationship with her father and the father's wife. B.A. knows Kehly's mother.

{¶3} Upon separation, Kehly initially moved in with her birth mother in Upper Sandusky, Ohio, but a few months later, she moved into the home of her

boyfriend Chad Bellachino ("Chad") in Perrysburg, Ohio. Kehly and Chad became engaged and moved to Northwood, Ohio, which is about an hour away from where Joshua lives. Joshua remained in the marital home after the separation, maintained the house and pursued its sale, which materialized in February 2012. At the time of the trial, he lived in a semi-private section of his uncle's home near Mt. Corey, Ohio. Joshua's mother continued to provide day care for B.A.

{¶4} Kehly is a high school graduate. She attended some college classes but did not obtain a degree. She worked at Hobby Lobby for eight years. During the parties' marriage, Kehly continued to work, although Joshua suggested that she stay at home. In December 2011, a few months after separating from Joshua, Kehly quit her job as a co-manager at Hobby Lobby, where she earned $45,230.00 in 2011. She stated that she had quit her job to have more time with her son. Kehly was unemployed at the time of the trial and testified that her boyfriend Chad would support them financially. She did, however, start an Internet business of selling flowers, from which she had earned $1,000.00 in the first eight months of 2012.

{¶5} Joshua is a college graduate and has a current teaching certificate. He worked full time as a teacher and a soccer coach for two years, earning $32,500.00 a year. After the expiration of his contract, Joshua did not work from May 2011 until August 2011. At the time of the trial, Joshua was working multiple part-time

jobs, but in September 2012 he began a full-time position at Fastenal, earning $24,000.00 a year in base salary, and additional money in monthly commissions, which in September 2012 amounted to $98.00. Although at the time of the trial Joshua was paying for private health insurance for B.A., he was supposed to become eligible for insurance through Fastenal.

{¶6} After the parties' separation, they attempted to share in the parenting of B.A. by exchanging the child between them. There have been problems occurring at the exchanges, however, and at some point, Joshua started recording the exchanges of the child with Kehly. Joshua's parents hired a private investigator.

{¶7} One day in September 2011, Kehly told Joshua that she was unable to care for B.A. Joshua took B.A. to his parents' home and went out of town. During that time, Kehly went to the marital home, where the locks had been changed, broke a door to enter the house, and took some items. She then went to pick up B.A. from Joshua's parents and refused to return the child to Joshua afterwards.

{¶8} On September 26, 2011, Kehly filed a complaint for divorce and requested the court to designate her as the residential parent of B.A. during the pendency of the divorce proceedings. (R. at 1, 9.) Joshua filed an answer and requested the trial court to issue temporary orders naming him the residential parent during the pendency of the proceedings. (R. at 23-24.) On November 10,

2011, the trial court determined that it needed more time to consider the temporary parenting issue and scheduled it for a hearing on December 21, 2011. (R. at 26.) The parties were ordered to operate under an alternating biweekly schedule of equal parenting time until further determination. (*Id.*) The record does not reflect what transpired in the following three months with respect to the hearing on the temporary parenting.

{¶9} During an exchange after Thanksgiving 2011, Chad was very aggressive toward Joshua. Afterwards, Joshua began using a video recorder during exchanges and brought multiple witnesses with him to the exchanges. In January 2012, after a disagreement over the time for picking up B.A., Chad kicked in the door of Joshua's house and tried to take B.A. from Joshua. After that, Joshua filed a Civil Stalking Protection Order against Chad.

{¶10} On February 21, 2012, Kehly again moved the trial court to name her the temporary residential parent of B.A. (R. at 36.) Joshua responded with a similar request on March 6, 2012. (R. at 41.) Additionally, Joshua requested that the trial court appoint a guardian ad litem for B.A. (R. at 42.) On March 23, 2012, the trial court appointed attorney Philip Johnson as the guardian ad litem for B.A. (R. at 46.)

{¶11} On April 25, 2012, Kehly brought B.A. to Joshua after completing her parenting time. She did not mention any incidents to have occurred that day. After the exchange, Joshua noticed that B.A. was not very responsive and had

bruises and scratches on his body. Joshua took the child to urgent care for examination, from which B.A. was transferred to the emergency room of the Blanchard Valley Hospital. The Children's Protective Services Unit ("CPSU") was notified about B.A.'s condition and began an investigation into possible child abuse. Kehly later explained that B.A. had played at a park that day and had been hit by another child on the curly slide. Joshua refused to send B.A. to the next scheduled visitation with Kehly. A few days later, Kehly attempted to "snatch" B.A. from Joshua's parents' house. After the child was directed by the grandparents into the house, Kehly kicked at the doors and yelled profanities.

{¶12} On May 7, 2012, Joshua moved for an ex parte emergency order terminating Kehly's companionship times with B.A., alleging that they were no longer in the child's best interest. (R. at 55.) The motion, and an attached affidavit, described B.A.'s negative reactions to visits with Kehly, his refusal to attend the visits, and the recent incidents, which raised Joshua's concerns over B.A.'s safety when in Kehly's care. (*Id.*; R. at 56.) On May 9, 2012, the trial court suspended the companionship schedule between Kehly and B.A., and established supervised visitations, while naming Joshua the temporary residential parent. (R. at 59.)

{¶13} The parties later reached a temporary agreement, which stated that Kehly should have companionship with B.A., which was to be supervised by either Joe or Debi Ballachino. (*See* R. at 69.) Upon the recommendation of the

guardian ad litem, the trial court approved the temporary companionship schedule pursuant to the agreement. (*Id.*) It appears that Kehly did not adhere to the trial court's order, however, because after picking up B.A. at the exchange point with Mrs. Bellachino, she dropped Mrs. Bellachino off at home and took B.A. to Kehly's house and for a walk, unsupervised. She told the guardian ad litem that she had been at Mrs. Bellachino's home at the time.

{¶14} On June 22, 2012, Kehly filed a motion to show cause and request for contempt, alleging that Joshua failed to follow the court-approved companionship agreement. (R. at 79.) After the report from CPSU was concluded without finding that child abuse had occurred, Kehly requested that the prior alternating parenting schedule be revived or a shared parenting plan be established. (R. at 80.) Kehly filed a proposed shared parenting plan with the trial court. (R. at 83.)

{¶15} The parties again entered into an agreement, which was approved by the trial court, allowing Kehly to have unsupervised parenting time with B.A. (R. at 87.) The agreement required an adult supervisor, other than Chad, to be present at all pickup and drop-off times to supervise the exchanges. (*Id.*) Kehly's next motion to increase parenting time was denied. (R. at 108.)

{¶16} On August 20 and August 24, 2012, the divorce hearings took place in front of the magistrate of the trial court. After these two hearings, the trial court increased parenting time between Kehly and B.A., and set out the parenting time

pursuant to Appendix J, Parenting Plan and Companionship Schedule of the Domestic Relations Rules of the Hancock County Common Pleas Court. (R. at 113.) Two weeks later, Kehly again filed a motion to show cause and for contempt, alleging that Joshua had not followed the court-ordered parenting schedule by failing to bring the child to the drop-off location. (R. at 114.) Another divorce hearing took place on October 15, 2012. Among other relevant testimony at the hearings was the guardian ad litem's recommendation that shared parenting was not in the best interest of the minor child and that Joshua should be the residential parent of B.A. (Tr. at 222:18-22; 223:1-225:14.)

{¶17} On January 2, 2013, the magistrate issued its decision, recommending that Joshua be the residential parent and legal custodian of B.A., while Kehly should have parenting time according to Appendix J of the Domestic Relations Rules of the Hancock County Common Pleas Court and additional parenting time until B.A. starts school, if she is available. (R. at 124, at 11-13.) The magistrate further recommended that Kehly should pay Joshua child support for B.A., which should be $341.89 per month if the health insurance coverage is provided, or $309.22 per month plus additional $72.42 for cash medical support if the private health insurance is not provided. (*Id.* at 23.) With respect to the parties' assets, the magistrate recommended that Kehly should retain the $3,000 debt owed to the parties by Kehly's mother, while Joshua should retain a checking account established in his name at the First National Bank of Pandora, with

$4,234.80 in it. (*Id.* at 24-25.) The remaining recommendations by the magistrate are not at issue in this appeal. The magistrate dismissed Kehly's motions for contempt. Kehly filed objections to the magistrate's decision. (R. at 140.)

{¶18} On March 20, 2013, Joshua filed a motion to show cause against Kehly and a motion for emergency order ex parte, asserting that Kehly had "failed and refused to return the child" to him after the last scheduled visitation on March 15, 2013. (R. at 130, 132.) An emergency order ex parte was issued on March 23, 2013, ordering Kehly to "immediately return" B.A. to Joshua and forbidding her from removing B.A. from the jurisdiction of the trial court. (R. at 138.) On April 16, 2013, Kehly moved for an order requiring Joshua to appear and show cause why he should not be held in contempt for his failure to allow her parenting time on the weekend of March 29 through 31, 2013. (R. at 141.) Both parties were found to be in contempt. (R. at 157, 158.)

{¶19} On July 29, 2013, the trial court overruled Kehly's objections to the magistrate's decision and adopted the magistrate's recommendations. (R. at 159.) On August 22, 2013, the trial court issued a decree of divorce, terminating the parties' marriage, dividing the parties' marital property, and ordering that Joshua be named B.A.'s residential parent and that Kehly pay child support to Joshua. (R. at 164.) Kehly now appeals alleging the following as her assignments of error:

**ASSIGNMENT OF ERROR 1**

**The Trial Court erred in naming the Defendant the residential parent and legal custodian of the parties' minor child.**

**ASSIGNMENT OF ERROR 2**

**The Trial Court erred in not finding that shared parenting was in the best interest of the parties' minor child.**

**ASSIGNMENT OF ERROR 3**

**The Trial Court erred in calculating child support in this matter.**

**ASSIGNMENT OF ERROR 4**

**The Trial Court erred in failing to divide marital assets in an equitable manner.**

### *1. Standard of Review*

**{¶20}** Our review of the trial court's decision in a domestic relations case concerning child custody, award of child support, and division of marital property is under the abuse of discretion standard. *Booth v. Booth*, 44 Ohio St.3d 142, 144, 541 N.E.2d 1028 (1989); *see also Neville v. Neville*, 99 Ohio St.3d 275, 2003-Ohio-3624, 791 N.E.2d 434, ¶ 5; *King v. King*, 3d Dist. Union No. 14-11-23, 2012-Ohio-1586, ¶ 9; *Schwarck v. Schwarck*, 3d Dist. Auglaize No. 2-11-24, 2012-Ohio-3902, ¶ 26. This standard requires that the trial court's reasoning not be disturbed unless it was "unreasonable, arbitrary or unconscionable," because the trial judge is best equipped to determine and weigh the credibility of the proffered testimony. *Davis v. Flickinger*, 77 Ohio St. 3d 415, 416, 418, 674

- 10 -

N.E.2d 1159 (1997); *Blakemore v. Blakemore*, 5 Ohio St. 3d 217, 219, 450 N.E.2d 1140 (1983). We apply this standard of review to Kehly's four assignments of error.

### 2. First and Second Assignments of Error— Allocation of Parental Rights

{¶21} Although Kehly labels her first assignment of error as a challenge to the finding that Joshua should be the primary residential parent and legal custodian of B.A., she does not support this challenge with specific arguments. Her discussion under both the first and second assignments of error concerns the trial court's finding that shared parenting was not in B.A.'s best interest. Accordingly, we address the two assignments of error together as a challenge to the trial court's allocation of parental rights and responsibilities over the parties' minor child, which includes its decision that shared parenting was not in B.A.'s best interest.

{¶22} Revised Code 3109.04 governs the trial court's award of parental rights and responsibilities. *King*, 2012-Ohio-1586, at ¶ 8. The statute requires that in allocating the parental rights and responsibilities, the court "shall take into account that which would be in the best interest of the children." R.C. 3109.04(B)(1); *Self v. Turner*, 3d Dist. Mercer No. 10-06-07, 2006-Ohio-6197, ¶ 6. It further provides for options available to the trial court when allocating parental rights and responsibilities: "primarily to one of the parents" (R.C. 3109.04(A)(1)), or "to both parents" (R.C. 3109.04(A)(2)). *See Fisher v.*

*Hasenjager*, 116 Ohio St.3d 53, 2007-Ohio-5589, 876 N.E.2d 546, ¶¶ 23-24; *see also* R.C. 3109.04(A), (D), (F), (G).  Under R.C. 3109.04(D)(1)(a)(iii), where, as here, "only one parent makes a request" for shared parenting and the trial court determines that shared parenting is not in the best interest of the child, the trial court may deny a party's motion requesting shared parenting and proceed as if the request for shared parenting had not been made.

{¶23} Further subsections of that statute spell out ten factors that the court shall consider to determine the best interest of the child, and five more factors to determine whether shared parenting is in the child's best interest.  R.C. 3109.04(F)(1) and (2).  Any additional relevant factors shall be considered as well. *Id.*

> In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:
>
> (a)   The wishes of the child's parents regarding the child's care;
>
> (b)   If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
>
> (c)   The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

R.C. 3109.04(F)(1).

In determining whether shared parenting is in the best interest of the children, the court shall consider all relevant factors, including, but not limited to, the factors enumerated in division (F)(1) of this section, the factors enumerated in section 3119.23 of the Revised Code, and all of the following factors:

(a) The ability of the parents to cooperate and make decisions jointly, with respect to the children;

(b) The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;

(c) Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;

(d) The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting;

(e) The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem.

R.C. 3109.04(F)(2).

{¶24} The magistrate and the trial court carefully reviewed all relevant factors and concluded that shared parenting was not in B.A.'s best interest. Among factors influencing the trial court's decision the relevant ones were: R.C. 3109.04(F)(1)(a), Kehly requested shared parenting or to be named the residential parent, but Joshua did not want shared parenting and wanted restrictions on Kehly's parenting time; R.C. 3109.04(F)(1)(c), B.A. had a strong and continuing relationship with his paternal grandparents and with father's extended family but

he had no relationship with his maternal grandfather although he "knew" his maternal grandmother; R.C. 3109.04(F)(1)(f) and (i), both parties failed to follow court-ordered visitation schedules and both would be reluctant to facilitate the other's parenting time, but Kehly was "more likely to aggressively impose her interpretation of parenting time at the expense of [Joshua's] parenting time." (R. at 124, at 10-11.) The trial court then noted that "the parties have shown no ability to cooperate and make decisions jointly" (R.C. 3109.04(F)(2)(a)); "they have no[t] demonstrated any ability to encourage the sharing of love, affection, and contact between the child and the other parent" (R.C. 3109.04(F)(2)(b)); "there is a history of the child having significant unexplained bruising after Plaintiff's parenting time" and "there are two instances where Plaintiff or her fiancé has tried to secure possession of the child by force" (R.C. 3109.04(F)(2)(c)); Plaintiff moved to the Toledo area, about an hour from Defendant's home" (R.C. 3109.04(F)(2)(d)); and "the guardian ad litem does not recommend shared parenting" (R.C. 3109.04(F)(2)(e)). (R. at 159, at 5, citing R. at 124.) The trial court further noted that Joshua did not believe that shared parenting was in the best interest of B.A. (*Id.* at 4.) It determined that due to the "considerable tension and hostility between the parties," the parties were unlikely to be willing or able to engage in the "indispensable communication" on the essential matters regarding B.A.'s care. (*Id.* at 5.)

{¶25} After finding that shared parenting was not in B.A.'s best interest, the trial court took into consideration the factors discussed above in deciding that Joshua should be named the child's residential parent and legal custodian. The trial court noted "that [Joshua's] home seems to provide a more stable and nurturing environment, due in part to the child's well-fostered relationship with [Joshua's] immediate and extended family." (*Id.* at 7.)

{¶26} Challenging the trial court's decision, Kehly asserts that shared parenting should have been granted because "the parties had operated under a shared parenting plan for the majority of time while the case was pending pursuant to a Temporary Order." (App't Br. at 6.) Although no shared parenting order appears in the record, Kehly alleges that a "shared parenting time arrangement lasted from September 2011 until April 25, 2012." (*Id.* at 11.) She claims that the parties were able to communicate and make decisions that were in the best interest of B.A. during that time. (*Id.*)

{¶27} Nevertheless, the record shows that throughout the pendency of the entire proceedings, Kehly and Joshua's communication with respect to B.A. was contentious. From the beginning of the proceedings in September 2011, when each party requested to be named the residential parent, continuing through February and March 2012, when each party renewed its request, and up until the conclusion of the case when each party was found in contempt, the parties repeatedly proved their inability to communicate effectively and resolve the issues

that arose while they attempted to share in the parenting of B.A. Their failure to communicate about an incident causing scratches and bruises on B.A.'s body, resulted in the ex parte emergency order limiting Kehly's visitations with B.A. Further evidence of unsuccessful communication with respect to B.A. are the incidents involving Kehly or Chad's attempts to forcibly remove B.A. from Joshua's custody. We do not find support for Kehly's assertion that the parties were able to communicate and make decisions in the best interest of B.A. Likewise, contrary to Kehly's statements in her brief that both parties testified that "they would be able to communicate in regards to the issue regarding their son" (App't Br. at 13), the trial transcript shows that while they understood the need for better communication regarding their child, they did not both know how they could achieve it. (*See, e.g.*, Tr. at 73-76; *cf.* Tr. at 336:7-24.)

{¶28} Kehly further claims that the trial court's decision is in error because Joshua was the one at fault for any failures of communication and that Joshua's actions of videotaping the exchanges or bringing witnesses to the exchanges affected B.A. in a negative way. (App't Br. at 12-13.) There is no evidence in the record that the presence of third parties at the exchanges or the recording of the exchanges had any effect on B.A., let alone a negative effect. Guardian ad litem opined that the videos had no effect on B.A. and that B.A. likely did not even know that he was being videotaped. (Tr. at 220:9-13.) As to the fault for failure

of communication, the trial court determined that both parties were unwilling to cooperate and that finding is supported by the record.

{¶29} Kehly next contends that the trial court erred in not ordering shared parenting because Joshua "had no objections to a shared parenting plan except as it related to a 50-50 time split." (App't Br. at 12, 15, citing Tr. at 86.) She refers to Joshua's affirmative response to a question by Kehly's counsel "So so far the only thing I've heard you object to in my shared parenting plan is Kehly would want her son half the time, right?" (Tr. at 86.) Nevertheless, regardless of whether Joshua had one or more objections to the shared parenting *plan* proposed by Kehly, the record shows that he continued to object to the idea that the parties share in the care and custody of B.A. The full review of the trial transcript reveals that Joshua had concerns over Kehly keeping B.A. overnight, and he wanted to limit Kehly's time with B.A. (Tr. at 77:13-78:9; 83:10-21.) Joshua's filings in the trial court show that he continuously requested to be named the residential parent rather than to share in the parenting with Kehly. Therefore, Kehly's suggestion that shared parenting should have been granted because Joshua did not have more objections to the proposed shared parenting *plan* has no merit. In view of the trial court's finding that shared parenting was not in the best interest of B.A., the number of Joshua's objections to the proposed plan is irrelevant.

{¶30} Kehly next disputes the trial court's finding that Joshua's home provided more stability for B.A. She claims that because she has resided in the

Case No. 5-13-26

same home since November 2011, while Joshua has changed residences, the trial court's finding of stability was improper. Nevertheless, the challenged finding was not based solely on the place of residence of the parties. This finding, as further explained by the magistrate, was based on the following facts:

> After separation, Defendant maintained a home, found a new home when the marital home was sold, remained in the area, found and maintained employment, sought and found a better job with better pay, maintained a relationship with his family and fostered the child's relationship with extended family. Plaintiff left the home, moved to the Toledo area, moved in with a new boyfriend, left her long time employment, has dabbled in internet sales, and has chosen not to seek employment. Her boyfriend actively inserted himself into the parties' relationship and has demonstrated a propensity toward aggression and violence. The evidence relating to the child's bruises is not quite sufficient to support a finding that the child is being physically abused. However the frequency and number of bruises raises concerns; particularly concerns of how well the child is being supervised in Plaintiff's home.
>
> Plaintiff stated that she quit her job to spend more time parenting her child. Her statement begs the question of why it was now in the child's best interest for her to be a stay at home mom when during the marriage and the child's infancy it was not in the child's best interest. Given all of the circumstances in this case, Plaintiff quitting her job is more of an indication of the instability in Plaintiff's life than an indication of intent to be a better parent. Her availability to parent does not outweigh the benefits of primarily residing with Defendant.

(R. at 124, at 12.) Based on the above, the trial court's finding that Joshua's home provided more stability for B.A. was supported by the record and was not an abuse of discretion.

- 19 -

**{¶31}** Kehly's final contention under these assignments of error concerns the magistrate's comment regarding her credibility. The magistrate's decision contains a two-paragraph section, which cites certain statements made by Kehly at the hearing and concludes with the following:

> Any of these statements could be accurate, and each may have a kernel of truth. However, taken together and considered in light of Plaintiff's demeanor at hearing, they establish that Plaintiff was attempting to create a false appearance. Her dissembling raises concerns about the credibility of her statements at hearing.

(R. at 124, at 9.)

**{¶32}** We first note that neither the magistrate nor the trial court used Kehly's credibility as one of the factors when determining the best interest of the child or when allocating parental rights and responsibilities. The challenged comments regarding Kehly's credibility appear in the section of the magistrate's decision entitled "Findings and Factual Background." (*See id.*) It does not appear that the findings in the part of the decision regarding allocation of parental rights and responsibilities contain any disputed *facts*. Therefore, it does not appear that Kehly's credibility affected the trial court's analysis of the factors considered for the best interest of the child. Accordingly, even if the finding regarding Kehly's credibility were erroneous, it would not warrant a reversal of the trial court's allocation of parental rights and responsibilities.

**{¶33}** We further acknowledge that "the trial court may rely upon the magistrate's credibility determinations when it reviews the magistrate's decision."

- 20 -

*Mackenbach v. Mackenbach*, 3d Dist. Hardin No. 6-11-03, 2012-Ohio-311, ¶ 9, citing *Gilleo v. Gilleo*, 3d Dist. Mercer No. 10-10-07, 2010-Ohio-5191, ¶ 47. It is well-established that the credibility determinations made by the factfinder, who "can hear and see as well as observe the body language, evaluate voice inflections, observe hand gestures, perceive the interplay between the witness and the examiner, and watch the witness's reaction to exhibits and the like," are given due deference by the reviewing court. *Perkins v. Channing*, 3d Dist. Seneca No. 13-03-36, 2003-Ohio-4874, ¶ 4; *accord State v. Dailey*, 3d Dist. Crawford, No. 3-07-23, 2008-Ohio-274, ¶ 7, quoting *State v. Thompson*, 127 Ohio App.3d 511, 529, 713 N.E.2d 456 (8th Dist.1998). Therefore, we will defer to the findings of the trier of fact because "[d]etermining credibility from a sterile transcript is a Herculean endeavor," and we will not reverse the magistrate's determination that Kehly's credibility at the hearing raised concerns because, based on our review of the record, this finding does not appear unreasonable, arbitrary, or unconscionable. *Perkins*, 2003-Ohio-4874, at ¶ 4; *Thompson*, 127 Ohio App.3d at 529.

{¶34} Our review of the record supports the trial court's findings and the analysis of factors mandated by R.C. 3109.04(F)(1) and (2), as well as the trial court's analysis of the additional factors. As the trial court pointed out, even if there was no evidence to support the suspected child abuse, it is troubling that the child was getting physically harmed while under Kehly's supervision. It is even more troubling that Kehly chose to not inform Joshua about the injuries, which

shows both failure of communication and failure to properly address the child's needs.  The evidence of aggressive behavior at the exchanges by both Kehly and her boyfriend is another factor weighing against placing the child in Kehly's care. All of the factors, together with the guardian ad litem's recommendation, support the conclusion that shared parenting should not have been granted and that Joshua should be named residential parent and legal custodian of B.A.

{¶35} Therefore, we hold that the trial court did not err in finding that shared parenting was not in the best interest of B.A., denying Kehly's motion for shared parenting, and naming Joshua the residential parent and legal custodian of B.A.  The first and second assignments of error are overruled.

### 3. *Third Assignment of Error—Amount of Child Support*

{¶36} In this assignment of error, Kehly challenges the trial court's calculation of the amount of child support she was ordered to pay.  As stated above, we review this challenge under the abuse of discretion standard.

{¶37} When computing child support, the trial court must evaluate the income of each of the parents.  *Drummer v. Drummer*, 3d Dist. Putnam No. 12-11-10, 2012-Ohio-3064, ¶ 24.  While reviewing the parties' income, the trial court may determine that a party is voluntarily unemployed or underemployed.  *Id.*  If the trial court makes such a finding, the trial court must consider the party's *potential* income, "which is income the parent would have earned if he or she had been fully employed."  *Id.*, citing R.C. 3119.01(C)(5)(b), and (11)(a).  In imputing

- 22 -

the potential income the trial court must review multiple factors, as mandated by R.C. 3119.01(C)(11)(a):

(i) The parent's prior employment experience;

(ii) The parent's education;

(iii) The parent's physical and mental disabilities, if any;

(iv) The availability of employment in the geographic area in which the parent resides;

(v) The prevailing wage and salary levels in the geographic area in which the parent resides;

(vi) The parent's special skills and training;

(vii) Whether there is evidence that the parent has the ability to earn the imputed income;

(viii) The age and special needs of the child for whom child support is being calculated under this section;

(ix) The parent's increased earning capacity because of experience;

(x) The parent's decreased earning capacity because of a felony conviction;

(xi) Any other relevant factor.

R.C. 3119.01(C)(11)(a).

{¶38} The trial court found that Kehly was voluntarily underemployed, working in her Internet flower sales business, where she had made $1,000.00 in the first eight months of 2012, after voluntarily quitting her full-time job as a co-manager at a Hobby Lobby store. In imputing the potential income to Kehly, the

trial court considered Kehly's prior employment where she earned $45,230 (factor (i) above); although it noted that the parties conceded Kehly's inability to find employment at a similar rate (factor vii). (R. at 159, at 10.) Even though Kehly did not have a college degree, her employment history, experience, as well as "skills and training in retail management" gave her an ability to earn substantial income (factors (ii), (vi), and (ix)). (R. at 159, at 10.) Kehly did not offer any evidence of any physical or mental disabilities or felony convictions (factors (iii) and (x)). There was no discussion of any special needs of B.A. (factor viii). There were no allegations that employment was unavailable in the geographic area where Kehly resided (factor iv). Likewise, no evidence was presented regarding prevailing wages and salary levels in the area (factor v). The trial court did not specifically discuss the factors for which no evidence was presented nor dispute raised. The trial court did review, as an additional factor, the minimum wage possible of $16,016.00, and concluded that Kehly's earning potential exceeds the minimum wage. (R. at 159, at 8.) The trial court adopted the magistrate's recommendation that Kehly's potential income is $30,623.00, which was "[t]he midpoint within [the] range" of the minimum wage and the amount "she earned with eight years of seniority with her prior employer." (R. at 124, at 14; R. at 159, at 8.)

{¶39} Kehly's major contention on appeal is that the trial court imputed too much potential income to her because it failed to consider the "availability of

employment in the area where [she] resided [factor (iv)], with the prevailing wage and salary levels wherein [sic] that geographic area [factor (v),] and whether [she] would have the ability to get a job in the same industry or practice that she had prior [possibly factor (xi)]." (App't Br. at 18-19.) We review the trial court's determination of the amount of income to be imputed to Kehly under an abuse-of-discretion standard. *O'Connor v. O'Connor*, 184 Ohio App.3d 538, 2009-Ohio-5436, 921 N.E.2d 700, ¶ 8 (3d Dist.), citing *Rock v. Cabral*, 67 Ohio St.3d 108, 616 N.E.2d 218 (1993), syllabus.

{¶40} We have previously stated that the trial court is "required to consider the statutory factors listed above when imputing income under R.C. 3119.01" in order to "closely approximate a parent's potential earning capacity when the parent is voluntarily unemployed." *O'Connor*, 2009-Ohio-5436, at ¶ 17, citing *Long v. Long*, 162 Ohio App.3d 422, 2005-Ohio-4052, 833 N.E.2d 809, ¶ 15-16 (3d Dist.). In *O'Connor*, we reversed the trial court's finding imputing minimum income to a parent, where the only evidence offered to the trial court supported "imputing * * * an income at or around the level of her earnings of $50,000 per year prior to leaving her job in November 2008." *Id.* at ¶ 19. We held,

> In the absence of any explanation in the record for imputing Denise's income at the minimum-wage level of $14,248 rather than imputing her income consistently with the statutory factors listed in R.C. 3119.01—and consistently with the only evidence in the record showing an income of over $50,000—we have no choice but to find the trial court's approval of CSEA's order imputing an income of $14,248 to Denise to be an abuse of discretion.

*Id.* at ¶ 20. Our reversal in *O'Connor* stemmed from complete lack of support for the trial court's finding of imputed minimum income and the presence of evidence in support of a much higher income. *See id.* at ¶¶ 19-20.

{¶41} Similarly, in *Henderson v. Henderson*, 3d Dist. Mercer No. 10-03-20, 2004-Ohio-1856, we reversed the trial court's decision, where imputing income to a parent was based only on the parent's "maximum possible salary" at his position. *Id.* at ¶ 7. In that case, "[t]here was no evidence nor consideration given regarding the job opportunities or salary levels" within the field in the county, no evidence regarding the parent's education level, the prevailing wage and salary levels, the parent's special skills and training, or his ability to earn the imputed income. *Id.* As such, there was no evidence to support the trial court's decision to impute income to the parent. *See also Wallace v. Wallace*, 195 Ohio App.3d 314, 2011-Ohio-4487, 959 N.E.2d 1075 (9th Dist.), where the Ninth District Court of Appeals reversed the trial court's order imputing an income "at a level nearly twice minimum wage" to a father, where "the record was devoid of any evidence as to Father's education level, licensures, or specialized training, such that the trial court could appropriately impute" such income to him. *Id.* at ¶ 15. The record in *Wallace*, contradicted the trial court's findings regarding the father's employment status and compensation history, resulting in the trial court's findings being contrary to the evidence. *Id.* at ¶¶ 14-18.

{¶42} The present case is significantly different from *O'Connor*, *Henderson*, and *Wallace*, because while no evidence was presented as to availability of employment and the prevailing wages in the area where Kehly resided, no evidence weighing against the trial court's findings was offered either. Furthermore, unlike in *O'Connor*, *Henderson*, and *Wallace*, there is sufficient support for the income imputed by the trial court to Kehly, which is about $14,600.00 less than what she had earned prior to voluntarily leaving her job. In the current case, the trial court did not impute an income without considering the *majority* of the relevant statutory factors. *See Henderson*, 2004-Ohio-1856, at ¶ 7. It considered evidence of Kehly's education, employment and salary history, skills, training, experience, as well as evidence of her inability to find employment at a similar rate. The factors discussed by the trial court support the finding of potential income at $30,623.00. Therefore, we will not reverse the trial court's decision imputing income to Kehly, which is well-supported by the evidence, merely because the trial court failed to explicitly address two of the statutory factors as to which the parties presented no dispute.

{¶43} Our reasoning here is consistent with the sister districts' treatment of similar situations. The Tenth District Court of Appeals declined to find an abuse of discretion were "no testimony or evidence was presented on the issues of employment availability or the prevailing wage and salary levels in [the parent's] geographic area" and the trial court failed to consider these elements when

calculating the potential income. *Chapman v. Chapman*, 10th Dist. Franklin No. 05AP-1238, 2007-Ohio-1414, ¶ 11. That court noted that "R.C. 3119.01(C)(11)(a) does not provide that evidence must be presented as to each factor in order for the trial court to impute income." *Id.* at ¶ 12. Therefore, "the fact that no one testified regarding the prevailing wages and the opportunities in the * * * industry in plaintiff's community did not preclude the trial court from imputing income" in the amount that was "clearly supported" by the evidence. *Id.* at ¶ 18. *See also In re J.M.G.*, 8th Dist. Cuyahoga No. 98990, 2013-Ohio-2693, ¶ 26, quoting *Strimbu v. Strimbu*, 11th Dist. Trumbull No. 2010-T-0104, 2011-Ohio-3629, ¶ 17 ("[T]he trial court has no obligation to investigate and develop evidence that the parties have failed to present."); *Wilburn v. Wilburn*, 169 Ohio App.3d 415, 2006-Ohio-5820, 863 N.E.2d 204, ¶ 38 (9th Dist.) ("It is not the trial court's duty to investigate or develop evidence not presented by the parties. Instead, the trial court may presume that any factor not substantiated by evidence is immaterial to its determination of imputing income."); *Keller v. Keller*, 9th Dist. Wayne No. 04CA0084, 2005-Ohio-3302, ¶ 17 ("The trial court has no obligation to investigate and develop evidence that the parties have failed to present. Where the parties failed to present evidence in regard to each of the factors of R.C. 3119.01(C)(11), it was reasonable for the trial court to consider such factors immaterial to a determination of the issues.").

{¶44} As to Kehly's suggestion that the trial court should have considered "whether [she] would have the ability to get a job in the same industry or practice that she had prior" (App't Br. at 19), we note that the ability to get a job in the same industry or practice is not one of the specifically enumerated factors that the trial court must consider under R.C. 3119.01(C)(11)(a). While the trial court could have considered it as a possible element under R.C. 3119.01(C)(11)(a)(xi), which requires the trial court to evaluate "[a]ny other relevant factor," its failure to do so is not a reversible error. The trial court's decision to impute income to Kehly was supported by sufficient evidence and the trial court did not impute to her the same income as she previously earned. Therefore, there is no relation between her alleged error and the finding that Kehly's imputed income is less than what she previously earned. In so far as the suggested factor would fall under R.C. 3119.01(C)(11)(a)(vii), "whether there is evidence that the parent has the ability to earn the imputed income," we note that the trial court did consider this factor, as already discussed above.

{¶45} Kehly next argues that the trial court erred in finding that Joshua "is not voluntarily underemployed." (App't Br. at 19.) The trial court's determination whether "a parent is voluntarily (*i.e.,* intentionally) unemployed or voluntarily underemployed is a question of fact for the trial court" and will not be disturbed on appeal absent an abuse of that discretion. *Rock v. Cabral*, 67 Ohio St.3d 108, 112, 616 N.E.2d 218 (1993). We do not find that the trial court abused

its discretion in not finding Joshua voluntarily underemployed, with his income of $25,176.00 annually, which combined his base salary and the commissions. The evidence in the case showed that Joshua continued to search for a teaching position after his prior teaching contract had expired and that he had worked multiple part-time jobs until an opportunity of a full-time position opened. (*See, e.g.*, Tr. at 94-96.) There is no support in the record for an allegation of voluntary underemployment on the part of Joshua. Accordingly, the trial court did not err in finding that Joshua was not voluntarily underemployed.

{¶46} For all of the above reasons, we find that the trial court did not abuse its discretion in imputing $30,623.00 of potential income to Kehly. Accordingly, we defer to the trial court's findings and affirm the calculation of child support in this case. The third assignment of error is overruled.

### 4. *Fourth Assignment of Error—Division of Marital Assets*

{¶47} In her final assignment of error, Kehly challenges the trial court's decision with respect to the parties' assets. In a divorce action, the trial court has broad discretion in the allocation of marital assets. *Neville v. Neville*, 99 Ohio St.3d 275, 2003-Ohio-3624, 791 N.E.2d 434, ¶ 5; *Schwarck v. Schwarck*, 3d Dist. Auglaize No. 2-11-24, 2012-Ohio-3902, ¶ 26. When dividing marital property, "a trial court must generally assign and consider the values of marital assets in order to equitably divide those assets." *Schwarck*, 2012-Ohio-3902, at ¶ 26.

In any divorce action, the starting point for a trial court's analysis is an equal division of marital assets. However, R.C. 3105.171(C) clearly provides that where an equal division would be inequitable, a trial court may not divide the marital property equally but instead must divide it in the manner that the court determines to be equitable.

*Neville*, 2003-Ohio-3624, at ¶ 5, citing R.C. 3105.171(C), *and Cherry v. Cherry*, 66 Ohio St.2d 348, 355, 421 N.E.2d 1293 (1981); *accord Schwarck*, 2012-Ohio-3902, at ¶ 26. Because the standard of review for an appellate court is an abuse of discretion, we will not reverse the trial court's distribution of marital assets unless "its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound." *Schwarck*, 2012-Ohio-3902, at ¶ 16; *see also Neville*, 2003-Ohio-3624, at ¶ 5.

**{¶48}** Among the items deemed Joshua and Kehly's marital property subject to division by the trial court were: a bank account at First National Bank of Pandora with a balance of $4,234.80; a Hobby Lobby retirement account with the value of $16,101.02; a State Teachers Retirement System (STRS) account with a "cash out" value of $9,985.88; a 2007 Chevy Impala, worth $4,931.00, subject to secured debt of $4,983.00; a 2005 Buick LaCrosse, worth $4,518.00, subject to secured debt of $2,092.00; a 1979 Kawasaki motorcycle, worth $50.00; a 1969 Oldsmobile, worth $500.00; and a loan to Kehly's mother, Crystal Davis, of $3,000.00. (R. at 124, at 6-8.)

{¶49} The trial court divided the assets "in a nearly equal" manner, awarding Kehly the 2007 Chevy Impala (negative net value ($52.00)), the Hobby Lobby retirement account, and the loan to Crystal Davis, for a total net assets of $19,049.02. Joshua was awarded the remaining assets, totaling in $17,196.68.[1] (R. at 159, at 14-15.) Kehly claims that trial court's division of assets was not equitable because "it will be very difficult for [Kehly] to actually be able to recoup any of the loan amount that was made to her birth mother" and because her 2007 Chevy Impala "had been repossessed and had no value." (App't Br. at 20.) She contends that the bank account with a balance of $4,234.80 should have been divided equally between the parties to achieve equitable division of the property.

{¶50} First, we reject Kehly's contention that she was harmed by being awarded the 2007 Chevy Impala that had no value. The trial court accounted for the negative value of the vehicle when dividing the property and subtracted the $52.00 negative value of the vehicle from the value of the assets awarded to Kehly. Kehly was never credited with $4,931.00 that was the value of the vehicle. Accordingly, the fact that the vehicle "had been repossessed and had no value" does not negatively affect the net value of the assets that she was awarded by the trial court.

---

[1] There appears to be a typographical error on the magistrate's calculate on page, where the balance of the First National Bank of Pandora was listed as $4,254.80 instead of $4,234.80, resulting in a final number for the net value of assets awarded to Joshua being twenty dollars higher than it should be. (*See* last page of R. at 124.) Because no party was ordered to pay cash to the other to equalize the asset division, this miscalculation has no effect on the division of the property, as it only illustrates the value of the assets actually awarded to Joshua. The correction of the number does not affect the distribution of assets.

**{¶51}** We also reject Kehly's claim that that she was harmed by the award of the value of $3,000.00 debt owed by her birth mother. In her brief, Kehly claims that "neither party expected to be paid back" on the loan (App't Br. at 19, citing Tr. at 119-120), but our review of the trial transcript contradicts this statement. (*See* Tr. at 309:22-311:10.) When Kehly was questioned by her counsel regarding the loan made to her mother, the following exchange occurred:

Q:    And do you expect to receive any of that money?

A:    Yes.

Q:    Okay. From your mother.

A:    From my mom, yes.

(Tr. at 311:4-10.) We do not find an abuse of discretion in the trial court's division of the property awarding Kehly the net value of a loan owed to the parties by her birth mother, which resulted in "a nearly equal" division of the assets. Similarly, we do not find an abuse of discretion in awarding Joshua the balance of the bank account at First National Bank of Pandora.

**{¶52}** Kehly's claims in the fourth assignment of error are contrary to the evidence and have no merit. As such, they do not warrant a reversal of the trial court's decision dividing the parties' property. The fourth assignment of error is overruled.

*Conclusion*

**{¶53}** Having reviewed the arguments, the briefs, and the record in this case, we find no error prejudicial to Appellant in the particulars assigned and argued. The judgment of the Common Pleas Court in Hancock County, Ohio, Domestic Relations Division is therefore affirmed.

***Judgment Affirmed***

**PRESTON, J., concurs.**

**/jlr**

**ROGERS, J. Concurring separately.**

**{¶53}** I fully concur with the result reached by the majority. I write separately only to comment on the procedural issue of approval of the final decree of divorce. To restate my concern:

> I find it curious * * * that the magistrate's signature appears on the final judgment entry, above that of the trial court judge. It is the decision of the judge that is to be embodied in a judgment entry, and not the recommendations or opinions of the magistrate. If the magistrate's approval is intended as a ministerial act to confirm that the entry contains all that it should, then the magistrate's signature, [along with counsel's signature] below that of the judge, would be sufficient to provide such confirmation. However, if the magistrate's prior approval of stated findings is *required* before the trial judge will sign an entry, I would personally, and professionally, find the procedure to be offensive.
>
> * * *

It is no wonder then that attorneys and parties feel the magistrate is making the decisions, the trial judge is rubber stamping those decisions, and that language to the effect that the judge has made an independent review of the transcript and evidence is nothing but regurgitation of the magic words from Civ.R. 53.

(Emphasis sic.) *Vian v. Vian*, 3d Dist. Mercer No. 10-13-05, 2013-Ohio-4560, ¶ 54, 57 (Rogers, J. concurring).